THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN T. ETHRIDGE, Defendant-Appellant.
Second District   No. 2—91—1046

Opinion filed March 24, 1993.

450

Alfred D. Stavros, of Alfred D. Stavros & Associates, of Wheeling (David W. Borenstein, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, John T. Ethridge, was indicted in the circuit court of Du Page County on three counts of reckless homicide (Ill. Rev. Stat. 1989, ch. 38, par. 9—3) premised upon his driving his vehicle into the oncoming lane of traffic (count I), based upon his operating a motor vehicle while under the influence of alcohol and driving his vehicle into the oncoming lane of traffic (count II), and founded upon his having a blood-alcohol concentration of .10 or more and driving his vehicle into the oncoming lane of traffic (count III). Following a bench trial, defendant was found guilty of count II and sentenced to two years and three months in prison.

Defendant raises the following issues on appeal: (1) whether a written report of defendant's blood-alcohol concentration (BAC) was properly admitted pursuant to section 11—501.4 of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.4); (2) whether the admissibility of the written report of defendant's BAC was "vitiated" by the State's failure to establish a proper foundation for the blood tests; (3) whether the State proved defendant's acts were the proximate cause or contributing cause of the victim's death; (4) whether the State proved defendant guilty beyond a reasonable doubt of operating a motor vehicle while under the influence of alcohol; (5) whether it was plain error for the trial court to allow the State's toxicologist to render an opinion as to the BAC at the time of the accident based on a combination of a passenger's BAC at the hospital and certain hypothetical facts relevant to defendant; (6) whether the trial court abused its discretion in barring the opinions of defendant's two expert witnesses and in excluding certain evidence; and (7) whether the trial court erred in denying defendant's motion for a directed finding and

motion to reconsider its ruling on the admissibility of the written blood-alcohol test results.

The following facts were developed at defendant's trial. On December 21, 1989, at approximately 8:10 p.m., defendant was involved in a three-vehicle collision on Route 64 (North Avenue) west of Klein Road in Du Page County, Illinois. Defendant was the driver of a Chevrolet Silverado pickup truck, and his passenger was William Murfree. The other two vehicles involved were a Ford Granada driven by the decedent, Richard Algrim, and a Buick Regal driven by Marie Ulrich (f/n/a Marie Pugliese).

According to defendant, he was driving north on Route 59 and turned east on North Avenue at a speed of about five miles per hour. After making the turn on to North Avenue, defendant observed a vehicle in the outside or curb lane about 400 feet ahead of his truck.

As he proceeded east on North Avenue, a large truck entered the eastbound lanes of North Avenue from a K mart located on the north side of the road. As he got within 50 to 75 feet of the truck, it started to enter the curb lane in which defendant was driving. Defendant let up on the accelerator and drove by the truck with the two right tires of his truck on the shoulder of the road. At that point, defendant was traveling at 40 miles per hour.

After passing the truck, defendant accelerated and continued east on North Avenue. As defendant topped a crest in the road, and while in the curb lane, he noticed that he was slowly approaching another vehicle traveling east in the curb lane. He then used his turn signal and changed to the inside or left lane and continued east at 55 miles per hour. The speed limit on North·Avenue at that location is 55 miles per hour. At that time the other vehicle was about 250 or 300 feet ahead of his. Klein Road was one-half mile east of the crest in the road.

As defendant approached the slower moving vehicle, it moved into his lane with no notice. He estimated the car was very close, maybe 15 feet in front of his truck, when it moved into his lane. At that point, defendant applied his brakes and turned his steering wheel to the right in an effort to avoid the car. There was a collision, and then defendant's truck "[shot] in a left direction very sharply." Defendant does not remember anything after that.

Marie Ulrich testified that there were two eastbound and two westbound lanes on North Avenue near Klein Road on December 21, 1989. On the evening of the accident, she was driving her Buick Regal east in the curb lane of North Avenue approaching Klein Road. As she approached Klein Road, she turned on her blinker, looked in both her

mirrors and checked her "blind spot." She did not see any traffic coming east from behind her so she proceeded to make a lane change to the inside lane. She was traveling about 40 miles per hour at that point.

As she proceeded to make the lane change, her vehicle was struck from behind. She could not recall whether she completed the lane change at the time of impact. Upon being struck, her driver's seat collapsed backward and her car spun off the road onto the north side of North Avenue. Ulrich told the police she checked her "blind spot" before she attempted the lane change. According to the testimony of the investigating officers, however, none of the police reports contained any such statement by Ulrich.

On cross-examination, Ulrich did not recall if her mirrors were frosted, but she did remember having her defroster on in the car. She did not recall whether she had activated her rear window defogger or if her rear window was fogged up when she got in her car that evening. On redirect examination, she testified she had no trouble seeing out of her windows or mirrors as she drove east on North Avenue that evening.

The evidence established that after striking the rear of Ulrich's car, defendant's truck crossed over into the westbound lanes striking the Ford Granada driven by Richard Algrim virtually head on. Both defendant's truck and the Granada came to rest in the westbound lanes of North Avenue.

The State's evidence also established that defendant and his passenger, William Murfree, had attended a work holiday party at a VFW that defendant's employer rented from 12 noon to 4 p.m. that day. Beer, wine, liquor and soft drinks were served along with food. The bar closed at 4 p.m. Jean Bergstrom tended bar for the party and testified that they began serving alcohol at 12:30 p.m. and stopped at 4 p.m.

William Murfree testified for the State that he arrived at the party a little after 1 p.m. He consumed beer at the party and saw defendant drinking beer. Although he was not with defendant the entire time he was at the party, he did speak to defendant 5 to 10 times that afternoon. Defendant had a beer each of those times.

Sometime between 5 and 6 p.m., he left the VFW with defendant. They went to a Burger King drive-up window, but Murfree could not recall what they ordered. They then drove to the Iron Horse tavern in West Chicago. They arrived there at about 6 or 6:30 p.m.

The Iron Horse serves both alcoholic beverages and food. Murfree could not remember seeing defendant drinking any alcohol but stated

that "[h]e probably was." Murfree and defendant left the Iron Horse at about 8 p.m.

On cross-examination, Murfree stated that defendant did not exhibit slurred speech or glassy eyes, nor did he stumble or stagger while at the VFW. He also observed on one occasion that defendant had a can of Coke in his hand. Murfree did not know how many beers defendant consumed at the VFW. In Murfree's opinion, defendant did not appear to be intoxicated at the VFW, while he drove his truck to the Burger King or when they left the Iron Horse tavern. According to Murfree, he consumed four to six 12-ounce beers at the VFW and one beer at the Iron Horse.

Murfree did not notice anything unusual about defendant's driving between the Iron Horse and his turning on to North Avenue. Defendant was driving at the speed limit, and there was nothing unusual about the manner in which he made the turn onto North Avenue. Murfree could not remember defendant driving at a speed of 80 miles per hour as they passed the K mart on North Avenue. On redirect examination, he admitted that he probably did not look at defendant's speedometer between the time they left the Iron Horse and the time of the accident but that he could tell that defendant was not speeding based on other cars on the road.

Barry Vaughn, a professional truck driver, testified that he was driving a 26- or 27-foot straight truck on the evening of the accident. According to Vaughn, at about 8 p.m. he was exiting the K mart parking lot on the north side of North Avenue and attempting to turn east onto North Avenue. As he did so, he observed defendant's pickup drive by him in the curb lane at an estimated speed of 80 miles per hour. In its comments regarding defendant's post-trial motion, the court stated that it did not consider Vaughn's testimony regarding defendant's vehicle because the point of observation was too remote from the accident scene.

Kenneth Tekiela, a paramedic, testified that he was dispatched to the accident scene at about 8:12 p.m. on December 21, 1989. He first observed defendant to be unconscious in the pickup truck. Tekiela administered emergency treatment to defendant at the scene and assisted in transporting defendant to Central Du Page Hospital (CDH). After testifying that he had observed hundreds of individuals who were under the influence of alcohol, Tekiela opined that defendant was under the influence of alcohol. The only observation of defendant he articulated as a basis for his opinion was the "definite, incredible smell of alcohol on [defendant's] breath." On cross-examination, Te-

kiela admitted he made no mention of alcohol on defendant's breath in his report.

Patty Buenz, a registered nurse, was so employed in the emergency room of CDH on the evening of December 21, 1989. Defendant was conscious when brought into the emergency room. Defendant told Buenz his first name was John, and he slurred his speech in doing so. As she was suctioning defendant, she smelled the odor of alcohol on his breath. She had to turn away because she was repulsed by the overwhelming smell. She had previously seen individuals under the influence of alcohol and opined that defendant was intoxicated. The additional basis for her opinion was the odor of alcohol on defendant's breath and his slurred speech, the fact that he exhibited little indication he was in pain despite his two broken legs and his failure to continue to follow simple commands.

On cross-examination, Buenz admitted she did not know if defendant normally had slurred speech, and she did not note his slurred speech on defendant's medical charts. She did note, however, a strong smell of alcohol on defendant's breath. She did not tell any doctor about the odor of alcohol on defendant's breath, and no blood was drawn for a blood-alcohol test.

Mary McSharry, the flight nurse that assisted with defendant's transportation via helicopter from CDH to Loyola Medical Center (Loyola), testified that she administered two neuromuscular blocking agents to defendant prior to transporting him to Loyola. The purpose was to maintain his airway and for the safety of defendant and the flight. McSharry tended to defendant during the flight. On cross-examination, she stated that she made no reference to defendant's speech or his having alcohol on his breath in her report. She explained that under the circumstances it was unimportant to have noticed whether defendant had alcohol on his breath. She could not remember any nurse at CDH telling her defendant had the odor of alcohol on his breath or that he had slurred speech.

Doctor Stephen Barnes testified that he was an intermediate resident assigned to the trauma team at Loyola on December 21, 1989. He was one of the primary people who first saw defendant in the emergency room at Loyola and assumed the overall care of defendant. According to Dr. Barnes, there is a standard protocol at Loyola that requires blood to be drawn by whatever method that is quickly available. Betadine, a nonalcoholic solution, is used to cleanse the skin prior to drawing the blood.

Pursuant to Dr. Barnes' treatment of defendant and the hospital protocol, blood was drawn from defendant for the purpose of ascer-

taining his BAC. The blood was analyzed in a laboratory at Loyola, and Dr. Barnes received the results of the BAC test while in a treating or primary physician capacity. Those results were received in the emergency room via a computer printout which is generated in the laboratory. Dr. Barnes noted in his trauma report that defendant's BAC was .194. He in turn relied upon that result in providing treatment and diagnosing defendant.

Dr. Barnes identified a clinical laboratory summary report for defendant which stated his BAC was .194 at 10:36 p.m. Dr. Barnes also identified a clinical laboratory summary report for William Murfree that stated Murfree's BAC to be .091 at 10:36 p.m. Dr. Barnes, however, never treated Murfree. Both reports were received in the emergency room via computer from the laboratory.

Dr. Barnes did not know who drew the blood from defendant that evening. He acknowledged that there were no other objective findings contained in his report that indicated that defendant was under the influence of alcohol or intoxicated. Dr. Barnes essentially stayed with defendant while he was treated in the emergency room, and defendant's family identified him as John Ethridge. Defendant suffered, in part, from two broken legs.

Nancy Kaczanowski, a registered nurse, testified that she was working as the trauma nurse at Loyola on the evening of December 21, 1989. It was her job to document the treatment given to defendant. Kaczanowski stated that the patient being treated was John Ethridge and that he had two broken legs.

She observed a doctor from the trauma team draw blood from defendant's femoral artery although she could not recall which doctor did so. She added that only a doctor is allowed to draw blood from a femoral artery. The doctor in turn handed her the syringe with the patient's blood, and she filled several vials with the blood. She then placed labels on the vials with the patient's name, birthdate, sex, race and medical record number. Kaczanowski proceeded to identify in court five vials into each of which she placed some of the blood drawn from the patient she believed to be John Ethridge.

After filling and labeling the vials, Kaczanowski completed a "chain of evidence" form which had John Ethridge's name and medical number at the top. Plaintiff's exhibit No. 13, which Kaczanowski identified as that form, contained the handwritten notations "H38146B" and "H38145U" which she could not identify. It further indicated by handwritten "x" that a "Drug toxicology Level-blood" should be performed. There is no "x" next to the place to request an

alcohol test. She gave the vials and the form to Ted Plopa to transport to the hospital laboratory.

On cross-examination she admitted that the document was unclear as to the time the blood was drawn and she could not tell whether the time on the form was "2205" or "2208." She also did not indicate on the form how many vials were filled, how many vials were sent to the laboratory or what vials were sent to the laboratory.

Thaddeus Plopa testified that he was working as an emergency room technician at Loyola on December 21, 1989. As part of his duties that evening, he transported blood vials identified as belonging to John Ethridge from the emergency room to the laboratory. Prior to leaving the emergency room, he checked the name and medical record number on the vials against the name and medical record number on the "chain of evidence" form, and they matched.

He then transported the vials and the form directly to the laboratory. At the laboratory, Plopa compared the name and number on the tube he left with the name and number on the form. The names and numbers matched as to John Ethridge. Plopa signed the form and gave the form to Gary Sinon at the laboratory.

On cross-examination, Plopa conceded he could not recall who gave him the blood vials in the emergency room. He explained that as to Ethridge he only left one blood vial and one urine vial at the laboratory. The remaining vials were left in other departments. The chain of evidence form is used only to record those vials left in the laboratory. Plopa agreed that defendant's exhibit No. 10, a "chain of evidence" form for William Murfree, contained an "x" next to the alcohol request whereas defendant's form did not.

Plopa also transported Murfree's blood vials to the laboratory. He could not remember who gave him Murfree's blood vials in the emergency room. On redirect examination, he explained that he followed the same verification procedures before and after transporting Murfree's blood to the laboratory.

Gary Sinon, a medical technologist employed in the laboratory at Loyola on the evening of December 21, 1989, testified that when he received John Ethridge's vials from Ted Plopa he verified that the names on the vials matched with that on the form accompanying the vials. He identified defendant's exhibit No. 13 as being the form delivered with John Ethridge's vials. Sinon wrote on that form a computer identification number for each vial received. The exhibit, as noted earlier, has the handwritten notations "H38146B" and "H38145U." The "H38146B" notation reflects the number assigned to Ethridge's blood vial.

He further labeled each vial with the appropriate laboratory computer number. In that regard, he identified a vial as one of the Ethridge blood vials delivered by Ted Plopa as having the label with the computer number on it. Sinon testified that the remaining three vials in evidence were not delivered to the laboratory.

Sinon identified People's exhibit No. 14-F as a vial containing the serum derived from Ethridge's blood vial. According to Sinon, the vial containing whole blood is placed in a centrifuge, and the serum is then placed in a transfer tube. A label is then placed on the transfer tube with the same laboratory computer number that is placed on the blood vial and the "chain of evidence" form along with the patient's medical number and name. Looking at exhibits Nos. 14-A, 14-B and 14-F, Sinon testified that the blood for the alcohol test came from vial 14-B.

On cross-examination, Sinon stated that he received only one blood vial for Murfree and one for Ethridge from Ted Plopa at the same time. Also, Sinon explained that by putting an "x" next to the request for a blood drug toxicology on the "chain of evidence" form, a blood-alcohol test would be conducted even if there was no "x" next to the request for an alcohol test. Sinon wrote the laboratory computer numbers "H38145B" and "H38146U" on Ethridge's form and "H38147U" and "H38149B" on Murfree's form. According to Sinon, the computer generates the numbers sequentially when tests are requested. Sinon did not know what happened to number "H38148." Sinon did not run the blood-alcohol test but gave the Ethridge vial to one of the other two laboratory technologists working that evening, either Mrs. Mateski or Mrs. Hayes.

Donna Mateski, a medical technologist working in Loyola's laboratory, testified that she performed the actual blood-alcohol test on Ethridge's blood serum. She did not recall who placed Ethridge's blood in the centrifuge to generate the serum. After completing the test, she verified that the information contained on the computer printout generated by the testing instrument matched the information on the label on the tube containing Ethridge's serum. The computer printout showed defendant's serum BAC to be .194. After verifying the validity of the serum and the accuracy of the results, Mateski signed the chain of evidence form.

The computer also generates the same BAC result in the emergency room. She identified a computer printout as being one received in the emergency room and indicating defendant's serum BAC to be .194. According to Mateski, the identification on the exhibit containing Ethridge's serum matched up to the identification on the blood

vial exhibit tested at 10:49 p.m. That serum was not derived from the blood vial exhibit tested at 10:36 p.m. The computer printout previously identified as one that would have been received in the emergency room showed a BAC test time of 10:36 p.m. On redirect examination, Mateski explained that a serum derived from Ethridge's blood vial was in fact tested for BAC although it was not the serum exhibit No. 14-F. She did not know whether the serum tested for Ethridge's BAC still existed. Loyola does not keep serum specimens for more than 24 hours, and someone must have secured the serum exhibit No. 14-F before the 24 hours expired.

Dr. Joerg Pirl, the chief toxicologist for the Illinois Department of Health in Chicago, testified as to his opinion that defendant had a whole blood BAC at the time of the accident of .18. In arriving at that opinion, he assumed that defendant was 25 years old, weighed about 200 pounds and was about 6 feet tall. He further assumed that he was at a party where he consumed food and alcohol from 1 to 4 p.m., that he consumed food sometime between 4 and 6 p.m., and that he was at a bar that served alcohol and food from 6 to 8 p.m. The hypothetical further provided that no alcohol was consumed between the time of the accident (8:10 p.m.) and the time defendant's blood was drawn (10:12 p.m.). In discussing his opinion, Pirl explained that he first converted the serum BAC of .194 to a whole blood BAC of .164 at 10:12 p.m. A normal elimination rate for a male is .015 per hour. A 200-pound male would get a maximum BAC of .018 per single drink. Because there was no certainty as to whether defendant consumed any alcohol between 4 and 8 p.m. and there was a possibility defendant could have consumed a drink at 7:59 p.m. which would not have been fully absorbed into defendant's blood at the time of the accident, Pirl assumed defendant did consume a drink at 7:59 p.m. In doing so, he gave the defendant the benefit of the doubt as his opinion of defendant's BAC at the time of the accident was lower because of the assumption. Absent that assumption, Dr. Pirl calculated defendant's BAC to be .194 at the time of the accident rather than .18.

Dr. Pirl also explained that a person's BAC will be lower if he receives fluids, blood or both because his blood will become more diluted. He would need to know how much fluid or blood was received to properly calculate the effect on the BAC.

On cross-examination, Dr. Pirl explained that whether defendant had consumed any food between 6 and 6:30 p.m. would not have had any significant effect on his calculations. He also noted that he did not assume defendant drank any particular amount of alcohol between 4 and 8 p.m. other than one drink at 7:59 p.m. He reiterated that had

he not made such an assumption, his opinion would have been that defendant had a higher BAC at the time of the accident. Dr. Pirl calculated that for defendant to have had a whole blood BAC of .164 at 10:12 p.m., he would have to have consumed about 17 drinks between 12 noon and 4 p.m. if he only drank during that period of time. According to Dr. Pirl, a drink is equivalent to a 12-ounce beer, a glass of wine or 1¼ ounces of 80-proof liquor. All of those would contain the same amount of alcohol. Dr. Pirl further characterized his use of a .015-elimination rate as being conservative.

Dr. Pirl was recalled as a defense witness, and the parties stipulated that William Murfree's serum BAC at CDH was .145. According to Dr. Pirl, Murfree's whole blood BAC at CDH was .122. He further calculated that Murfree's whole blood BAC would be .077 if his serum BAC was .091. If a person had a whole blood BAC of .122, and he was in the elimination phase, he would have a whole blood BAC of .107 one hour later, .092 two hours later and .078 three hours later. It would take a 6-foot, 200-pound person three hours to go from a whole blood BAC of .122 to a whole blood BAC of .077.

On cross-examination, Dr. Pirl explained that it is possible for a person's serum BAC to go from .145 (.122 whole blood) to .091 (.077 whole blood) in one hour. He added that if a person received fluids or blood transfusions that would also reduce the BAC. On redirect examination, he stated that it would be reasonable to have such a decrease in BAC given the proper circumstances. He added that 30% of a person's blood would have to be replaced with fluids, either by blood transfusion, intravenous fluids or a combination, to effect a decrease from .145 to .091 in an hour and absent such a replacement of blood such a decrease would not be reasonable.

William Dickinson, an accident reconstructionist, testified that there is a human element involved in accident reconstruction and that he takes into account tests and studies on the human element when he does an accident reconstruction. On June 7, 1990, he conducted an on-site survey of the accident scene in this case. Prior to that, he reviewed a police report regarding the accident.

Prior to surveying the accident scene, Dickinson went to the police impound facility to inspect and photograph the three vehicles involved in the accident. Dickinson took several photographs of each vehicle, measured the amount of crush on each vehicle, examined the lights, and noted the overall mechanical structure of the vehicles.

After completing the vehicle inspection, Dickinson surveyed the accident scene. This included recording the lane and road widths, locating landmarks, calculating the grade, and using the police report to

record and reposition the vehicles. He also inspected the road surface for any gouges or other evidence regarding the collision of the vehicles. Dickinson eventually took all of the data from his vehicle inspection and site survey and, applying the laws of physics, reconstructed the accident.

Dickinson testified that he located a gouge mark on the roadway which he used to assist him in his determination of how defendant's truck impacted the rear of the Buick Regal. He explained that defendant's truck would have to have been steered so as to have impacted the Buick at a slight angle in order to have caused the Buick to travel in a direction to have resulted in the gouge mark. He also used the gouge mark to determine the position of the Buick and in turn utilized that determination to calculate reaction time available to defendant. It was also used, in part, to support his conclusion that defendant's truck was in the inside lane and to measure the distance between the point of collision and Klein Road. He also used the gouge mark to conclude that the Buick did not spin after impact with defendant's truck.

According to Dickinson, he also considered human factors such as reaction times. Studies have established that the average reaction time for an expected event is 1.5 seconds, and he took that into account when he considered certain lane-change data. He further considered the testimony of Ulrich that she merged into defendant's lane when he applied the reaction time and lane-change data. He admitted the gouge mark was an important part of his investigation. Dickinson was unaware of any studies concerning reaction time for alcohol-impaired persons.

On cross-examination, Dickinson conceded that he took into account the gouge mark in arriving at his opinion of how the sequence of events occurred. The only reason he was able to determine the location of the initial impact between the Buick and defendant's truck was the gouge mark. Absent the gouge mark, the only way he could have determined the initial point of impact was to rely on a photograph showing some apparent tire marks in the grass adjacent to the roadway which photograph was taken at a time unknown to Dickinson. Dickinson admitted that if he did not know where the initial impact happened, then his opinion as to the dynamics of the accident would "change some."

He further admitted that the first time he saw the gouge mark was June 7, 1990, five to six months after the accident. That was the first time he learned of the gouge mark, and he found no reference to it in the police reports.

According to Dickinson, the human factor or human element, such as the driving habits of the individuals involved, plays a part in accident reconstruction. While he took into account that the decedent was a conservative driver, he did not consider the fact that defendant was drinking in reconstructing the accident. He did not because he has no training to know what effect drinking has on an individual's reaction time.

James Sobek, a registered professional engineer employed by the same company as Dickinson, testified that Dickinson's rendition of the accident was correct and that he concurred in Dickinson's opinion. He also assisted Dickinson in creating day and night versions of a computer-generated video recreation of the accident.

The State moved to strike the testimony of both Dickinson and Sobek and to bar admission of the two videos as well as a diagram prepared by them. In granting the State's motion, the court, as to the conclusions of the experts, noted that it was not convinced that a gouge mark was present on the night of the accident and overlooked by the police. The court in turn found that there was an insufficient basis for the experts to have reached their conclusion. The court also stated that the experts stuck to one theory without considering alternatives such as the human factors of braking or swerving. Additionally, the court emphasized that the reliance on the gouge mark when none was observed by the police was "exceedingly important in the Court's ruling." The court did not strike any of the testimony having a factual basis such as evidence of crush and lights. Lastly, the court barred the videos for the same reasons it barred the experts' conclusions.

The court found defendant guilty of count II premised upon his being under the influence of alcohol and having driven his vehicle into the oncoming lane of traffic. The court expressly stated that it was "not making any finding as to .10" because it found that defendant was under the influence as charged in count II. The court also made no finding as to count I because it considered counts I and II as "practically merged into one act." The court sentenced defendant to two years and three months in the penitentiary, and defendant appealed.

Defendant's initial appellate contention is that the State failed to comply with the requirements of section 11—501.4 of the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.4) pertaining to the admission of his blood-alcohol test result from Loyola. Specifically, defendant first argues that the blood-alcohol evidence fails to comport with section 11—501.4 because there was no evidence to show what

specific medical treatment was administered by Dr. Barnes, who allegedly treated defendant. Second, defendant maintains that the State failed to introduce any evidence that the blood-alcohol test was ordered by a "physician on duty" as required by section 11—501.4. Lastly, defendant contends that the prosecution failed to show that Dr. Barnes received and considered the written results of defendant's blood test.

■ Section 11—501.4 provides in part:

"§11—501.4. Admissibility of written blood alcohol test results conducted in the regular course of providing emergency medical treatment. (a) Notwithstanding any other provision of law, the written results of blood alcohol tests conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for any violation of Section 11—501 of this Code or a similar provision of a local ordinance, or in prosecutions for reckless homicide brought under the Criminal Code of 1961, when each of the following criteria are met:

(1) the blood alcohol tests were ordered by a physician on duty at the hospital emergency room and were performed in the regular course of providing emergency medical treatment in order to assist the physician in diagnosis or treatment;

(2) the blood alcohol tests were performed by the hospital's own laboratory; and

(3) the written results of the blood alcohol tests were received and considered by the physician on duty at the hospital emergency room to assist that physician in diagnosis or treatment." (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501.4.)

Neither side cites, nor does our research reveal, any Illinois case addressing the precise issue of whether a computer-generated printout complies with the requirement of section 11—501.4 that the results of the blood-alcohol test be written. In another context, the appellate court has held that Supreme Court Rule 236(a) (134 Ill. 2d R. 236(a)) and section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—5(a)), which address the admissibility of business records, apply equally to computer and noncomputer records. (*People v. Turner* (1992), 233 Ill. App. 3d 449, 453.) Furthermore, our supreme court has stated that computer-generated printouts are the tangible result of the computer's internal operations. (*People v. Holowko* (1985), 109 Ill. 2d 187, 191.) While neither case directly answers the issue raised here, they lend persuasive support to

our conclusion that the computer-generated printout constituted a written result within the meaning of section 11—501.4.

We can perceive no practical or legal difference between a written recordation of the laboratory blood-alcohol test results and a printout generated by a computer integrally connected to the testing instrument. It would certainly make no difference to a physician involved in the emergency treatment of a patient that laboratory results such as BAC are presented via a computer-generated printout rather than by some other form of written documentation. In our view, an efficient and effective way to deliver this needed information to a doctor engaged in the life and death struggle that often occurs in an emergency room is to deliver it directly from the laboratory to the emergency room via computer. To do otherwise might hinder the delivery of emergency medical services. Because of our belief that computer-generated printouts may be commonly used by emergency medical care providers under circumstances similar to those present in this case, we hold that such printouts are the functional equivalent of written test results as contemplated by section 11—501.4. To hold to the contrary would effectively eviscerate the applicability of section 11—501.4 in these types of cases.

Defendant's reliance on *People v. Reardon* (1991), 212 Ill. App. 3d 44, and *People v. Mueller* (1991), 221 Ill. App. 3d 234, is misplaced because in those cases the written results were not in existence at the time of treatment. Here, the written result, *i.e.*, the computer printout, was in fact in existence at the time defendant was treated.

■ We next consider defendant's argument that the BAC test was not ordered by a physician on duty. This argument flies in the face of Dr. Barnes' testimony that the protocol at Loyola at the time defendant was treated was to have a blood-alcohol test done. Because of the existence of this "standing order," it would have been superfluous for Dr. Barnes to have ordered the test. It is our opinion that the protocol of having the BAC test performed under these circumstances complies with the requirement of a blood-alcohol test ordered by a physician on duty. To hold otherwise would impart a hypertechnical meaning to the statute and disregard the seemingly legitimate practice followed by Loyola in this case.

■ Defendant's final argument concerning section 11—501.4 is that there is no evidence as to the specific treatment Dr. Barnes administered to defendant. It is defendant's apparent argument that without such evidence there has been no showing that Dr. Barnes used the BAC results to assist him in the treatment and diagnosis of defendant. While we agree with defendant that Dr. Barnes did not

specify the precise treatment he gave to defendant nor exactly how he utilized the BAC test results in diagnosing defendant, he did state unequivocally that he relied on the test results in diagnosing and treating defendant. Such testimony satisfies the requirement in section 11—501.4.

The next issue raised by defendant is whether the admission of the written results of defendant's BAC test was vitiated by the State's failure to establish a proper foundation for the blood. Specifically, defendant appears to argue that the State's failure to produce at trial the actual vial containing defendant's serum that was tested by the laboratory establishes that the State failed to lay a proper foundation for the admission of defendant's BAC test results.

■■ Defendant cites no authority, and we find none, that requires the State to introduce the actual blood serum of defendant as part of the foundation for admissibility of the blood-test results under section 11—501.4. Rather, the foundational question presented is whether it was in fact defendant's blood that was tested and produced the result sought to be admitted at trial. Provided the State can show that it was defendant's blood that was used to determine defendant's BAC, then such BAC test results may be introduced under section 11—501.4 if the other criteria for admissibility set forth in that section are met. We have reviewed the testimony of the various Loyola personnel involved in the handling and testing of defendant's blood and conclude that the State established that it was in fact defendant's blood that produced the BAC test result introduced against him at trial.

Defendant next contends that the State failed to prove beyond a reasonable doubt that defendant's acts were the proximate or a contributing cause of Richard Algrim's death. A defendant is guilty of reckless homicide when the State proves beyond a reasonable doubt that: (1) he was operating a motor vehicle; (2) he unintentionally caused a death while operating the vehicle; and (3) the acts which caused the death were performed recklessly so as to create a likelihood of death or great bodily harm to some person. (*People v. Wilson* (1991), 143 Ill. 2d 236, 245.) Recklessness is a mental state that serves as an element of reckless homicide. (*People v. Smith* (1992), 149 Ill. 2d 558, 563.) Intoxication is not an element of reckless homicide; however, evidence of intoxication is probative on the issue of recklessness. (*Smith*, 149 Ill. 2d at 564-65.) If the State introduces evidence of intoxication in a reckless homicide prosecution, it need only present some evidence of intoxication from which, along with other circumstances, recklessness may be inferred. *Smith*, 149 Ill. 2d at 565.

Whether recklessness has been proved is an issue to be decided by the trier of fact. (*Smith*, 149 Ill. 2d at 565.) The crucial inquiry when reviewing the sufficiency of the evidence to support a reckless homicide conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Smith*, 149 Ill. 2d at 565.) We may not reverse the conviction unless the evidence was so unreasonable, improbable or so unsatisfactory as to justify entertaining a reasonable doubt of defendant's guilt. *Wilson*, 143 Ill. 2d at 246-47.

■ Here, defendant argues that the causation element was not proved beyond a reasonable doubt. The State was not required to prove that defendant's acts were the sole and immediate cause of death, however, but rather that they were a contributing cause such that death did not result from a cause unconnected with defendant. (*People v. Gruner* (1985), 130 Ill. App. 3d 1042, 1053; see *People v. Sleboda* (1988), 166 Ill. App. 3d 42, 55-57.) The evidence established that defendant's vehicle struck the rear of the Buick and then veered across the oncoming lanes of traffic striking the decedent's car virtually head on. Defendant contends that the driver of the Buick caused defendant to collide with the Buick and eventually strike decedent's vehicle. Marie Ulrich, driver of the Buick, testified, however, that she activated her turn signal, checked both rearview mirrors, looked in her "blind spot" and proceeded to change lanes after ascertaining that she could not see any vehicles behind her. While defendant maintains that Ulrich's credibility was placed in question by the absence of any reference in one police report to her conveying such information to the police, it was up to the trial court to determine whether Ulrich's testimony was believable. Furthermore, one officer testified that she did state that she used her signal and checked her mirrors before changing lanes although his report does not mention her having checked her "blind spot." The record suggests no basis for rejecting the trial court's apparent conclusion that Ulrich's testimony was credible.

An assumption that Ulrich's driving was a factor contributing to the accident does not preclude a determination that defendant's conduct was also a contributing cause. For example, in accepting Ulrich's testimony that she signaled before making a lane change, the trial court might reasonably have concluded either that defendant's version of her failure to signal was untruthful or that defendant's failure to observe her signal was attributable to his state of intoxication. It is further noted that the trial court was also equipped with other cir-

cumstantial evidence relating to the physical facts of the collision between defendant's vehicle and Ulrich's Buick. Because the evidence was sufficient to support the conclusion that defendant's conduct was a contributory cause of Richard Algrim's death, it was unnecessary for the trial court to have engaged in an analysis of the degree of fault between defendant and Ulrich. We believe the evidence, when viewed in a light most favorable to the State, was such that a rational trier of fact could have found that defendant was a contributing cause of decedent's death.

■ The next issue is whether defendant was proved guilty beyond a reasonable doubt of being under the influence of alcohol. Defendant initially argues that the question of his being under the influence was an element of the offense of reckless homicide because the State chose to include in count II of the indictment language from the reckless homicide statute concerning when a person is under the influence of alcohol (see Ill. Rev. Stat. 1989, ch. 38, par. 9—3(c)(2)). Thus, defendant asserts it was necessary for the State to prove beyond a reasonable doubt that he was under the influence in order to prove him guilty of reckless homicide as charged in count II.

Our supreme court has recently held that intoxication is not an element of reckless homicide. (*People v. Smith* (1992), 149 Ill. 2d 558, 564.) It is recklessness, not intoxication or any other fact underlying an inference of this mental state, that the State must prove beyond a reasonable doubt. (*Smith*, 149 Ill. 2d at 565.) Evidence of intoxication, while not an element of the charged offense, is probative on the issue of recklessness. (*Smith*, 149 Ill. 2d at 565.) If the State introduces evidence of intoxication in a reckless homicide case, it need only present some evidence of intoxication from which, along with other circumstances, recklessness may be inferred. *Smith*, 149 Ill. 2d at 565.

In the present case the State, in count II of the indictment, apprised defendant that the basis of that reckless homicide charge was that he was under the influence of alcohol and that he drove into the oncoming lane of traffic on North Avenue. It further identified that the theory by which it would prove defendant was under the influence was to show he was "under the influence of alcohol to a degree which rendered him incapable of safely driving." Such language in count II did not, however, convert intoxication, the theory upon which count II was in part premised, into an element of the offense.

■ Considering the evidence as a whole, it is apparent that the State introduced sufficient evidence of intoxication, together with the fact that defendant's reckless acts resulted in his entering the oncoming lane of traffic, to support the finding of guilty. Two witnesses

opined that defendant was under the influence. One testified that he had observed other persons on prior occasions who were under the influence of alcohol. He also smelled the odor of alcohol on defendant's breath. The other witness opined that defendant was under the influence based upon her prior exposure to intoxicated persons as well as her observations of defendant. According to her, defendant had an overwhelming smell of alcohol on his breath, slurred the one word he spoke to her, exhibited little indication of pain despite two broken legs and failed to continue to follow simple commands. This testimony was sufficient to establish that defendant was under the influence of alcohol, and when combined with the evidence that defendant's truck struck decedent's car in decedent's lane of traffic, was sufficient to prove beyond a reasonable doubt that defendant acted recklessly in causing the death of Richard Algrim.

Furthermore, we reject defendant's argument that his physical condition was more rationally attributable to severe trauma as opposed to intoxication. Where there is conflicting evidence of intoxication, it is the function of the trier of fact to determine the credibility of the witnesses and the weight to be accorded their testimony. (*Smith*, 149 Ill. 2d at 566.) A reviewing court must not invade the province of the fact finder by hypothesizing other possible explanations for defendant's appearance and behavior. (*Smith*, 149 Ill. 2d at 566.) The trial court's conclusion in this case that defendant exhibited behavior consistent with being intoxicated was supported by the evidence, and as such we will not disturb that conclusion.

We next address the issue of whether the trial court erred in allowing the State's toxicologist to render an opinion as to defendant's BAC at the time of the accident based on a combination of Murfree's BAC at Loyola hospital and certain hypothetical facts relevant to defendant. Specifically, defendant argues that it was improper for the toxicologist to have applied back extrapolation to Murfree's BAC of .091 by using physical characteristics and factors pertinent to defendant and his activities prior to the accident.

We begin our analysis by noting that this issue was waived based upon defendant's failure to raise it in his written post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) We need not consider whether any error was plain error (see 134 Ill. 2d R. 615(a)), however, as we determine no error occurred here.

An expert is one whose qualifications and experience give him knowledge not known to the average person which would aid the trier of fact in its determination. (*People v. Moore* (1990), 199 Ill. App. 3d 747, 772.) Expert testimony can be introduced only upon a proper

foundation of facts already in evidence. (*Moore*, 199 Ill. App. 3d at 772.) In this case, defendant offered the testimony of the toxicologist, Dr. Pirl, in his case in chief in an effort to demonstrate that defendant's BAC at Loyola was actually .091 and not .194 as the State maintained. Defendant did so by introducing Murfree's BAC of .145 taken at CDH and asking the toxicologist whether it was possible that Murfree's BAC could have gone from .145 to .091 in about one hour. It is clear that defendant wanted to suggest, directly or indirectly, that the .091 BAC was in fact defendant's and not Murfree's.

■ The State, in response, asked Dr. Pirl on cross-examination to calculate what the .091 BAC would have been at the time of the accident based upon the previously submitted hypothetical facts relevant to defendant and his pre-accident activities. It is apparent that the State wanted to show what the BAC would have been for defendant at the time of the accident in the event the trial court accepted defendant's theory that there was a mix up in the blood tests and that defendant's BAC was actually .091 rather than .194. We find this to be legitimate cross-examination and a proper response to the defense theory that there was a mix-up of blood at Loyola.

Even were this to have been error, it was harmless. As discussed above, there was adequate independent evidence of defendant's intoxication to support the conclusion that he acted recklessly in causing the death of Richard Algrim. Furthermore, it is apparent from the trial court's comments in finding defendant guilty and its failure to enter a finding as to the count based on .10 BAC that it gave little, if any, weight to defendant's BAC at the time of the accident.

Defendant next contends that the trial court abused its discretion in striking the testimony of his two accident reconstruction experts. We initially point out that the trial court did not strike the testimony of defendant's experts in its entirety, but, rather, struck only their conclusions as to how the accident happened. In doing so, the court noted that it was not convinced that a gouge mark was present on the night of the accident and emphasized that the reliance on the gouge mark was important to the court's ruling. The court also mentioned the experts' failure to consider alternative theories based on human factors such as braking or swerving.

The general rule is that expert accident reconstruction testimony should be allowed where it is necessary to rely on knowledge and application of principles of physics, engineering and other sciences beyond the ken of the trier of fact. (*People v. Reding* (1989), 191 Ill. App. 3d 424, 438.) The four elements necessary to admit accident reconstruction testimony are: (1) the testimony or opinion must be nec-

essary; (2) the trier of fact must be assisted by testimony regarding knowledge of physics or the sciences beyond its ordinary ken; (3) the proffered witness must be sufficiently possessed of the requisite qualifications as an expert; and (4) there must be sufficient physical data upon which the expert may base conclusions and opinions. *Reding*, 191 Ill. App. 3d at 438-39.

Here, William Dickinson testified that he located a gouge mark on the roadway almost six months after the accident. He used the gouge mark to assist him in determining how defendant's truck impacted the rear of the Buick. He further used the gouge mark to determine the position of the Buick and in turn utilized that determination to calculate the reaction time available to defendant. He also used the gouge mark, in part, to support his conclusion that defendant's truck was in the inside lane, to calculate the distance between Klein Road and the point of collision, and to conclude that the Buick did not spin after being hit by defendant's truck, which was contrary to Ulrich's testimony that the Buick did spin. He also conceded on cross-examination that the only reason he was able to determine the point of impact between the Buick and defendant's truck was the gouge mark. He admitted that if he did not know where the initial impact occurred then his opinion as to the dynamics of the accident would "change some."

In our opinion, the gouge mark was an essential piece of physical data which Dickinson relied on in rendering his opinion as to how the accident occurred. The testimony of the investigating officers, however, was that no gouge mark was discovered on the roadway the night of the accident. Furthermore, the gouge mark was discovered almost six months later. The gouge mark could have resulted from any number of causes during that period of time. More importantly, there was no connection shown between the gouge mark and either the Buick or defendant's truck other than Dickinson's testimony that the front bumper of the Buick was hanging down when he inspected it and that the bumper could have caused the gouge mark. There is again no evidence demonstrating that the bumper actually caused the gouge mark other than Dickinson's speculation. There is no evidence, for example, that the bumper showed signs of abrasion associated with a gouge mark or that the bumper was even hanging down at the accident scene. Absent any evidence that the gouge mark was a result of the accident, it was well within the trial court's discretion to have concluded that the testimony of Dickinson and Sobek lacked sufficient physical data upon which to base their conclusions as to how the accident occurred. Because of our holding that the gouge mark, an essential component of the experts' opinions, was an unreli-

able piece of physical data and therefore rendered their opinions as to how the accident occurred inadmissible, we need not reach the question of whether the failure to consider alternative theories and human factors was itself sufficient to strike their testimony.

Defendant also raises the argument that it was error not to allow Dickinson's testimony regarding the physical conditions of the three vehicles involved in the accident and further error not to admit three photographs into evidence. One of the photographs was a side view of the Buick, one was a front passenger view of defendant's truck, and one was a photograph which shows the gouge mark found by Dickinson in June 1990. Defendant's argument in this portion of his brief is less than clear. We are unable to determine the basis for defendant's contention that the trial court erred in excluding the three photographs. Furthermore, defendant fails to articulate what harm he suffered as a result of the exclusion of the photographs. We are entitled to a well-reasoned argument. (See 134 Ill. 2d R. 341(e)(7).) Nevertheless, in an effort to do justice in this case we will consider defendant's contentions.

We interpret defendant's argument to be that it was improper to strike his testimony regarding the conditions of the vehicles on June 7, 1990, as well as photographs of three vehicles taken at that time. He apparently also considers it error to have excluded a photograph of the gouge mark taken on June 7, but we cannot discern why that was error or how that pertains to this argument.

As to the testimony concerning the condition of the vehicles, the trial court stated that it was striking only the experts' conclusions concerning how the accident occurred and not any testimony having a factual basis such as crush damage and the condition of the lights on the vehicles. We interpret the trial court's comments to be contrary to defendant's assertion that the court did not allow the testimony based on Dickinson's inspection of the vehicles. The only way Dickinson could have testified regarding the condition of the vehicles was based on his inspection. Thus, the trial court did not bar his testimony on that basis, and no error occurred.

Defendant's final appellate contention is that the trial court erred in denying his motion for a directed finding and his motion to reconsider the admissibility of his BAC test results at the close of the State's case. Because of our determination that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, we need not consider the propriety of the trial court's ruling on the motion for directed finding. Likewise, we need not address the denial of defend-

ant's motion to reconsider the admissibility of his BAC test results as we have already concluded those results were properly admitted.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

WOODWARD and GEIGER, JJ., concur.