NO. 4-96-0902

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

v. ) Champaign County

NATHANIEL CALDWELL, JR., ) No. 95CF411

Defendant-Appellant. ) 

) Honorable

) Harold L. Jensen,

) Judge Presiding.

JUSTICE GREEN delivered the opinion of the court: 

On March 31, 1995, defendant, Nathaniel Caldwell, Jr., was charged with the first degree murder (720 ILCS 5/9-1(a)(2) (West 1994)) of his 97-year-old great-aunt, Neppie Donaldson, aggra­vated battery (720 ILCS 5/12-4(b)(6) (West 1994)) of Brian Gallagher (a Champaign police officer), and resisting or ob­struct­ing a peace officer (720 ILCS 5/31-1(a) (West 1994)).  Follow­ing a jury trial on Septem­ber 18, 1996, defendant was found guilty of involun­tary manslaugh­ter and was sentenced to an extended term of 10 years' imprisonment.  Defendant appeals his conviction, contending the State failed to prove beyond a reason­able doubt that (1) he performed some crimi­nal act to cause injury to Donaldson and (2) a supervening event unconnected to him was not the cause of Donaldson's death.

On appeal, defendant maintains (1) there was no direct evi­dence that he broke Donaldson's neck and severed her spinal cord by striking her head with a cast-iron skillet; (2) there was no blood or hair found on the skillet, and the blood found in the kitchen and on defendant's shoes and clothing was not consis­tent with stain­ing that is associated with violent blows to a person; (3) Donaldson's medical history showed she was prone to falling and the findings of the treating physician and forensic patholo­gist permitted an inference that Donaldson's fractured neck was caused by her falling onto an object; and (4) when she was near death, Donaldson indi­cat­ed her injuries were acciden­tal­ly caused. Defendant also maintains that Donaldson's conscious decision to be disconnected from her ventilator was an interven­ing act that relieved him of responsi­bility for her death.

The State's case consisted of the following evidence:  (1) defendant's hostility toward Donaldson prior to her inju­ry and his throwing of a cast-iron skillet; (2) his consciousness of guilt as shown by his attempt to clean Donaldson's blood from the kitchen and his resistance and aggres­sion toward the paramedics, fire­fight­ers, and police, who were providing aid to Donaldson; (3) foren­sic blood evidence consis­tent with the theory that defendant struck Donald­son's head with a cast-iron skil­let; (4) Donald­son's sponta­neous statement to the para­med­ics that she had been hit; and (5) expert medical opinions that Donald­son's injuries were caused by rapid, blunt force trauma to her head and neck consis­tent with being struck by an object and inconsistent with the theory that she fell from a standing position or against a flat surface.

Wallace Pearson, Donaldson's second cousin who visited her about three times a week, testified at trial that on the morning of March 31, 1995, he noticed the porch light on at Donaldson's home and, thinking this was unusual, stopped by to talk to her.  Pearson stated Donaldson was usually very happy, but when she answered the door, she seemed upset and her spirits were "very low."  Pearson testified that the defendant (Donaldson's nephew) was in the kitchen cooking, turned the burner on the stove up too high and, when Donaldson told him to turn it down, defendant told Donaldson he was tired of her telling him to do certain things in the kitchen and he was going to do what he wanted.  Pearson stated he told defendant not to treat Donaldson so disrespectfully, and defen­dant, swearing, told Pearson he hated him and then told Donaldson to shut her mouth and not to come into the kitchen.  Pearson stated defen­dant then threw a cast-iron skil­let through the doorway of the kitch­en where Donaldson was standing, and it went over Donaldson's head and hit Pearson on the leg as he was seated in a chair in the living room.  Pearson admit­ted he did not know whether defen­dant was throwing the skillet at him or at Donaldson, but he said Donaldson was much closer to defendant than he was.  Pearson stated defen­dant then picked up a medium-sized, black frying pan and held it down at his side in his right hand while his left hand was on another blackened pan that was sitting on the stove.  Pearson indicated he told Donaldson to sit and leave defendant alone so defendant would "not do anything to her."  Pearson stated defen­dant ordered him to leave the house, which he did so that defendant would calm down.  Pearson stated that when he left Donaldson was not injured.  Pearson testi­fied he then drove to his home three blocks away and immedi­ately tele­phoned defendant's aunt, Neppie Caldwell, in Loda.  He told her to come to town because he was afraid defendant was going to hurt Donaldson. While he was on the telephone, Pearson stated he heard sirens and saw a fire truck pull up to Donaldson's home.

Paramedic Lawrence Sapp testified that when he arrived, defendant merely pointed to the living room and said, "[s]he's in there."  Sapp stated (1) Donaldson was slumped in a chair in the living room; (2) there was dried blood on the left side of her forehead; and (3) Donaldson was conscious, but she could not move her arms or legs.  Sapp stated initially Donaldson was able to speak in a soft, quiet voice, but she did not respond when he first asked her what happened.  When Sapp then asked defendant what hap­pened, defen­dant was angry and agitated, and stated, "[w]hat do you think hap­pened?"  Sapp stated that when he asked defendant if Donaldson had fallen, defendant indicated she had fallen in the kitchen.  He stated, however, that defendant offered no further expla­na­tion regard­ing Donaldson's inju­ries, never offered to help, and never asked about her condi­tion.  Sapp indicated that during his second conversation with Donaldson, when he asked her if she had fallen, she did not respond; howev­er, when he asked if she had been hit, she nodded her head slight­ly in the affir­mative.  Sapp stated at this point Donaldson was no longer able to speak and could only give nonverbal re­spons­es.

Terry Swift and Donald Rhodes, both members of the City of Champaign fire and rescue squad, testified that when they arrived at the house, defendant was standing in the doorway of the porch and shouted, "[g]et the *** out of here and go back to the fire department.  You're not needed here."  The firemen indicated defen­dant allowed them into the house only when Sapp told him he needed their assistance to put Donaldson into the ambu­lance.  Swift and Rhodes both said that when another police officer asked how Donaldson fell, defendant responded to the effect of, "I'll show you how *** she fell," or "[h]ow *** do you think she fell[?]"  Defendant then struck the officer.

Brian Gallagher, a Champaign police officer, testified he arrived at the scene at approximately 10:45 a.m., and defen­dant was standing in the doorway between the front porch and the living room.  He said he initially asked defendant how he was and defendant responded he was doing fine.  When Gallagher asked what happened, defendant's attitude changed and he stated it was none of the officer's business.  He said defendant was stressed, anxious, and used profanity.  When Gallagher asked how Donaldson fell, defendant said words to the effect of "[h]ow *** do you fall" and struck Gallagher's face with his fists.  Gallagher said he was forced to use pepper spray to restrain defendant, and defendant then went outside and tried to walk away.  Gallagher stopped him and, with the help of the firemen, placed him under arrest.

Joe Siefferman, a crime scene technician with the Illinois State Police, testified that when he arrived at the scene, he found a bloodstained sweater draped over a chair in the living room, a bloodstained rug, and various areas of blood in the kitchen but none elsewhere in the house.  He described several cast-iron pans he found in the kitchen, one of which had blood on the handle.  He stated he saw blood "spatters" on a pencil, on the face of overhead and base cabinet doors in the kitchen, and on paper towels in a waste can near the kitchen sink.  He said he also found a bucket near the kitchen sink with a bloodstained rag mop.  Siefferman stated blood was smeared on a rubber floor mat that appeared to have been wiped with a cloth and there was a light wiping of blood on the floor of the kitch­en.

Kristen Boster, a forensic scientist with the Illinois State Police, testified she examined bloodstains from the rag mop head and the bottom cuff of the jeans defendant was wearing at the time he was arrested, and those stains matched Donaldson's deoxyribonucleic acid (DNA) profile and were dissimilar to defendant's pro­file.  She stated Donaldson's DNA profile would occur in approximately 1 in 300 million African-Americans and 1 in 700 million caucasians.  Donaldson was African-American.

Dr. James Scott Gregory testified he was an emergency room physician and trauma surgeon at Carle Foundation Hospital in Urbana and he treated Donaldson when she arrived at the hospital on March 31, 1995.  He said he was called to the trauma room by physicians who were in the process of resuscitating Donaldson following her cardiopulmonary arrest.  He said he observed a laceration over her left forehead and eyebrow involving a cut and crushing of the skin and she had a fracture of the cervical spine just below the base of her skull.  Gregory stated the fracture severed the spinal cord and she had no ability to breathe on her own or maintain her blood pressure.  He indicated her prognosis included ventilator dependence and complete paralysis of her arms and legs.  He discussed the ramifications of her physical condi­tion with her.  He said Donaldson could nod her head a bit to answer "yes" questions and flex her head and mouth to answer "no" questions.  He said she understood what paralysis was and "empha­tically" indicated she did not want to live with complete paraly­sis.  He also asked questions regarding her birthday and Thanks­giv­ing, which her family stated she answered appropriately, indicat­ing her level of consciousness was normal.

Gregory further testified that he asked Donaldson if she had fallen and she "shook her head yes."  When he asked her if she had been hit, she indicated "no."  He stated that she paused before answering both questions, although she had answered previous questions very quickly.  When he asked her if she wanted to remain on the ventilator, she indicated "no."  He said the ventilator was then removed and she died within minutes.  

Gregory stated that based upon his exami­na­tion of Donaldson, to a reasonable degree of medical certainty, her injuries were consistent with being struck in the head with a heavy object such as a pan.  He said the laceration and cut injury to the scalp area, as well as the injuries to the spinal cord and neck, were consistent with and could have been caused by a blow to the front of the head that made her head arch back­ward.

On cross-examination, Gregory testified that due to the lack of mention of a skull fracture in the autopsy report, Donaldson's injury could be consistent with a serious fall "given certain circumstances," such as falling into an object or strik­ing an object as she fell.  He ac­knowl­edged that on the day he treated Donald­son, he was of the opinion her injuries could have been caused by a blow or a fall.  He stated, however, that had Donald­son sustained a skull fracture, he would be more inclined to exclude a fall as the cause of her injuries.  Finally, Gregory admitted that if Donaldson had not requested that life support be removed, it was "medically possible" that she could have been alive, albeit a quadriplegic, at the time of trial.

Dr. Violette Hnilica, a forensic pathologist, testified she performed the autopsy on Donaldson.  She described the injury to Donaldson's left forehead and noted she had a tear that went all the way through the skin to the bone and a large amount of hemorrhage around the wound.  She also described Donald­son's broken neck.  Hnilica was of the opinion that Donaldson's death was the result of blunt force injuries of the head and neck.  She thought the injuries were caused by something with a flat or curved, rather than a sharp or penetrating, surface.  She was also of the opinion that this type of injury was not consis­tent with a fall from her normal height.  She said it was much more massive than she sees with falls, except for falls from massive heights such as falling out of a many-story building.  She stated the injuries were consistent with being struck in the forehead with an object.  She agreed, however, that Donaldson had a small bruise on her hip that was consistent with a fall.

Kevin Lumney, a forensic biologist with the Illinois State Police crime laboratory, testified he examined a skillet taken from Donaldson's home and found no human hairs on it.  Stipulated testimony indicated a forensic scientist who examined trace evidence recovered from the skillet also did not find any human hair.  Paula Cardosi, a forensic scientist for the Illinois State Police crime laboratory, testified she did not observe any metallic particles in swabs taken from Donaldson's wound.

Dr. Marshall Fogle testified Donaldson became his patient in 1979 and she had many health problems.  He stated she had a heart disease that could cause a loss of consciousness as a result of the illness.  He said her medical conditions could be trig­gered by stressful events.  Fogle stated Donaldson also had osteoarthritis and had complained that her right leg sometimes gave out.

Fogle testified that in 1993, Donaldson fell without any warning due to a "drop attack" or sudden loss of conscious­ness.  He said that, in May 1994, Donaldson again fell without loss of consciousness and, in November 1994, she complained of falling frequently.

Dr. Thomas Malee, an optometrist, testified he last treated Donaldson in March 1994.  At that time, she indicated she had broken her glasses when she fell.  He said she had cataracts in both eyes that impaired her vision.

Caldwell, defendant's aunt, testified she had visited Donaldson and defen­dant on a regular basis over the previous 10 years and had never seen defendant act in a violent manner toward Donaldson.  She said Donaldson never expressed any fear of defendant or made any complaints of abuse by him.  Anna Owens, a friend of Donaldson's, and Joan Redding, defendant's sister, con­curred in Caldwell's assessment of defendant's behav­ior toward Donaldson.  Lucie Green, Donaldson's great-niece, testified, however, that Donaldson was compassion­ate and caring toward defendant and defendant was indifferent to Donaldson.  Moreover, police detective Charles Shepard testified in rebuttal that when he interviewed Caldwell and Owens on March 31, 1995, after Donaldson's death, they told him they had seen defendant get angry and yell and curse at Donaldson on other occasions.

Defendant contends on appeal that the State failed to prove beyond a reasonable doubt that he was the cause of Donald­son's injuries, first, because there was no direct evidence to support the State's theory that he broke her neck by striking her with a cast-iron skillet and, second, because a supervening event, 
i.e.
, the removal of life support, that was unconnected to defendant was the cause of her death.

The standard of review for questions involving the sufficiency of the evidence is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Oaks
, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996).

The parties agree that in a murder prosecution the prosecution must establish, as part of the 
corpus
 
delicti
, that death resulted from a criminal agency.  
People v. Rogers
, 263 Ill. App. 3d 120, 126, 635 N.E.2d 889, 893 (1994).  

"Once the State has shown 'the existence, through the act of the accused, of a suffi­cient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defen­dant.'"  
People v. Gittings
, 136 Ill. App. 3d 655, 661, 483 N.E.2d 553, 559 (1985), quoting 
People v. Meyers
, 392 Ill. 355, 359, 64 N.E.2d 531, 533 (1945).

Defendant argues the State proved only that (1) Donald­son suffered a fractured neck, which could have been caused by a blow to the head, a fall from massive heights, or a fall onto an object; (2) defendant engaged in an altercation with Pearson and Donaldson before her injury; (3) defendant threw a skillet that flew over Donaldson's head and hit Pearson; and (4) defendant was agitated, as shown by his behavior and fight with a police officer.  Defendant argues this evidence was insufficient to prove beyond a reasonable doubt that Donaldson's injury was caused by a criminal agency.

Defendant notes there was no forensic evidence he struck Donaldson with a cast-iron skillet and no evidence that blood or hair had been cleaned from the skillet.

Defendant further argues there was extensive evidence that Donaldson had a history of falling.  Finally, he contends Donaldson's "dying declaration" when Dr. Gregory asked if she had fallen was that she had not been hit.

However, Dr. Hnilica testified that in her expert opinion Donaldson's injuries could not have resulted from a fall from a normal height and only a fall from "massive heights" or a blow to the head could have caused her injuries.  Dr. Gregory also testi­fied that in his opinion the injuries were consistent with a blow to the head.  Finally, defendant's anger and dislike toward Donaldson moments before her neck was fractured were relevant to show he was the cause of her injuries.  See 
People v. Crayton
, 175 Ill. App. 3d 932, 946-47, 530 N.E.2d 651, 660-61 (1988).  The jury could have reason­ably found, based upon the evidence, that defendant was the cause of Donaldson's injuries.

Donaldson next argues that regardless of whether the State proved that some act of his caused Donaldson's injuries, the State failed to prove beyond a reasonable doubt that Donald­son's decision to be withdrawn from life support was an interven­ing event that was not the cause of Donaldson's death.  Defen­dant notes Dr. Gregory admitted on cross-examination that it was "medically possible" for Donaldson to still be alive had she not opted to have life support withdrawn.  He claims her decision was a supervening act that insulated him from responsibility for her death.

The question of whether a causal connection exists between defendant's conduct and the death of the deceased is one for the trier of fact.  
People v. Brackett
, 117 Ill. 2d 170, 177, 510 N.E.2d 877, 
881 (1987).  An accused is not criminally respon­si­ble for the death of another unless his actions are the cause of the death.  He contends the State was required to prove beyond a reasonable doubt that defendant's act was a contributing cause of the death, such that the death did not result from a source unconnected with the defendant's act.  
People v. Eth­ridge
, 243 Ill. App. 3d 446, 465, 610 N.E.2d 1305, 1317 (1993).

A supervening cause has been defined as "[a] new effective cause which, operating independently of anything else, becomes proximate cause of accident."  Black's Law Dictionary 1438 (6th ed. 1979).  Defendant maintains Donaldson's decision to have life support withdrawn was a supervening cause of her death since she would not have died had she stayed on life support.

Defendant cites 
State v. Ruane
, 912 S.W.2d 766 (Tenn. 1995), where the court found that a victim's decision to be removed from life support could be a supervening cause.  The court determined, however, under the facts presented there, that the decision did not rise to the level of a superven­ing cause.  
Ruane
, 
912 S.W.2d at 775.

In 
Ruane
, the defendant shot the victim and the victim suffered a severed spinal column in the neck.  Medical testimony was presented that the victim could have lived with a ventilator and would have been alive at the time of trial.  The victim deter­mined he did not want to live with life support assistance and, when the life support was terminated, he died.  That defen­dant was subse­quently convicted of second degree murder.  The appel­late court deter­mined that where the death resulted from a fore­seeable act of the accused, the victim's conscious decision to withdraw life support was not a supervening act.  
Ruane
, 912 S.W.2d at 775.

Defendant argues here, unlike in 
Ruane
, that Illinois has the Living Will Act that provides the right to have life support withdrawn "in instances of a terminal condition."  755 ILCS 35/1 (West 1992).  A "[t]erminal condition" is defined as "an incurable and irreversible condition which is such that death is imminent and the application of death delaying procedures serves only to prolong the dying process."  755 ILCS 35/2(h) (West 1992).  Defendant argues this statute provides a procedure for withdrawal of life support only for terminally ill adults who are at the point where death is imminent.  He notes Donaldson would be alive if not for the withdrawal of life support, and the Illinois Living Will Act (755 ILCS 35/1 
et
 
seq
. (West 1992)) does not give the right to have life support withdrawn in people with her condi­tion.  He notes Donaldson enjoyed life, and she had no living will nor gave any other indication she would not have desired life with mechan­ical assistance.  He concludes, there­fore, that the conscious decision to withdraw life support was a supervening act and his actions were not the cause of Donaldson's death.

This court has previously considered the question of whether the removal of life support was the cause of death in a homicide case.  In 
People v. Driver
, 62 Ill. App. 3d 847, 379 N.E.2d 840 (1978), the defendant was convicted of murder follow­ing the death of the victim after he was disconnected from a respirator at the request of the victim's family.  This court, noting the victim's brain wave pattern was flat, held the cause of the victim's death was the beating on January 22, 1976, and not the removal from the respirator on January 27, 1976.

In 
State v. Guess
, 44 Conn. App. 790, 692 A.2d 849 (1997), the court upheld a murder conviction where the victim had no evidence of brain stem function after the defendant shot him in the head and the victim's family directed that life support be withdrawn.  The court there did not adopt a definition of death that included brain death but, instead, looked to traditional principles of causation.  Thus, the court determined that defen­dant could be found guilty of murder, despite the action of another in removing the victim from life support systems.  The court held that it was reasonably foreseeable that relatives of the victim would request the removal of life support systems after a person had received a massive bullet wound to the brain and was being kept alive only by machinery, with chances for recovery slim.  The court stated, "[t]he removal of those systems is not an intervening cause breaking the chain of causa­tion that started with the defendant's act."  
Guess
, 44 Conn. App. at 800, 692 A.2d at 857.

In Illinois, a competent person has the right to refuse all types of medical treatment, including life-saving or life-sustaining procedures.  
In re Estate of Longeway
, 133 Ill. 2d 33, 44-45, 549 N.E.2d 292, 297 (1989).  Donaldson's decision to remove artificial life support was consistent with Illinois policy and was the natural and foreseeable result of defendant's wrong­ful act.  The cause of her death was not the removal of the ventilator, but the criminal act that defendant performed which gener­ated the need for the life support in the first in­stance.  Accordingly, for the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

GARMAN, P.J., and STEIGMANN, J., concur.