## STATE OF CONNECTICUT *v.* BARRY GUESS
## (15846)

Dupont, C. J., and Landau and Spear, Js.

Argued January 27—officially released April 22, 1997

*Elizabeth M. Inkster,* assistant public defender, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

DUPONT, C. J. The defendant, Barry Guess, was charged in one count with murder in violation of General Statutes §§ 53a-8 and 53a-54a (a)[1] and in a second count with carrying a pistol without a permit in violation of General Statutes § 29-35.[2] After a trial by jury, the

[1] General Statutes § 53a-8 provides: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"(b) A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 29-35 provides: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any

defendant was found guilty of both counts, and was sentenced to an effective term of fifty years incarceration. The defendant argues on appeal[3] that the trial court improperly (1) admitted hearsay evidence, (2) charged the jury regarding a witness' credibility, (3) admitted evidence of the victim's animosity toward the defendant, (4) rejected the defendant's offer of proof regarding the motives of others to shoot the victim and (5) found that there was sufficient evidence to sustain a finding of probable cause prior to trial.[4]

Certain facts are relevant. During the early morning of March 1, 1992, the defendant and two friends, Michael

other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33.

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit on his person while carrying such pistol or revolver."

[3] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[4] The finding of probable cause was rendered by the court, *Hartmere, J.*, and the judgment of conviction was rendered by the court, *Fracasse, J.* A finding of probable cause to hold a defendant for trial is not a final judgment. *State* v. *Atkins*, 203 Conn. 33, 522 A.2d 1234 (1987). The finding is properly reviewable after an appeal is taken from a judgment of conviction that

McCrea and Lamont Green, visited a convenience store in their neighborhood in New Haven. While inside the store, they encountered the victim, Melvin McCoy, and his friend, Germaine Young. The defendant knew the victim because the defendant was then dating Mary Streater, who had had a child with the victim.

The two groups stared at each other in the store without exchanging any words. The victim and Young left the store and got into the victim's car, with the victim in the driver's seat. Before pulling away from the curb, Young noticed the other three men leave the store and cross the street. The defendant and McCrea stayed near the intersection, while Green headed up the street. The victim drove the car toward where the two men were walking. Young saw the defendant begin to pull out of his pocket what Young recognized to be the handle of a black pistol. Young ducked down in the car and yelled to the victim to do the same. Young remained in that position while he heard about fifteen to twenty gun shots. After the shots were over and the car had rolled to a stop, Young looked out of the rear of the car to see two men running away. Young called to the victim, who did not respond. The victim was bleeding from his head.

Young got out of the car and ran to a nearby house. He asked the resident to call an ambulance. Then Young called the victim's mother and told her that the victim had been shot by the defendant. Young went outside and saw Officer Michael Quinn, whom he knew from his neighborhood. Quinn noticed that Young was frantic and shaking. Young told Quinn, "They shot Mel. They shot Mel. . . . Barry did it. Barry did it." Young also spoke with another police officer, Officer Marcus Pisciotti, at the scene.

follows a trial. See *State* v. *Greenfield,* 228 Conn. 62, 634 A.2d 879 (1993); *State* v. *McClam,* 44 Conn. App. 198, 689 A.2d 475 (1997).

I

We first address the defendant's claim that there was insufficient evidence to establish probable cause for murder. He argues that the victim's family's direction to hospital personnel to disconnect the victim's life support systems was the cause of the victim's death, not any action performed by the defendant. The defendant argues that because there is no statutory definition of death, the common-law definition must control.

"Article first, § 8, of the Connecticut constitution, as amended, provides in part that [n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law. . . . In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . We have held, however, that where the evidence offered at a probable cause hearing is insufficient to establish probable cause, the trial court lacks jurisdiction over the defendant's person." (Citations omitted; internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992). When the sufficiency of evidence at a probable cause hearing is questioned, and "the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [court's] decision; where the factual basis of

the court's decision is challenged we must determine whether the facts set out in the . . . decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 237–38, 673 A.2d 1098 (1996); *State* v. *Royce*, 29 Conn. App. 512, 516, 616 A.2d 284 (1992).

Evidence was presented at the probable cause hearing by Joseph Piepmeier, the neurosurgeon at Yale New Haven Hospital who had treated the victim the morning of the shooting. Piepmeier testified that the victim arrived at the hospital at 1:59 a.m. in a coma with a heart rate of forty and no respiratory function. There was no evidence of brain stem function. According to Piepmeier, "[b]rain stem activity or brain stem function deals with the very basic functions of survival such as integration of movement, swallowing, breathing, controlling heart rate and blood vessels, controlling lung function, controlling how your gut works. . . . [T]he very basic things that physiologically make us work [are] in the brain stem."

After the victim was intubated and put on a ventilator and respirator, his heart rate and blood pressure rose. He could not breathe on his own. After a while, there were discussions with the victim's family regarding disconnecting the ventilator or respirator. At about 9:30 a.m., a test was performed to determine if the victim could breathe on his own, and it was determined that he could not. His heart could not beat on its own without life support systems. According to Piepmeier, the victim was brain dead because there was no evidence of any brain activity. He went on to testify that "any death, any death, regardless of mechanism, involves a cessation of brain activity. Death, in my estimation can only occur one way, one final common pathway, and that is the cessation of brain activity, regardless of what the heart's

doing or the kidneys are doing, the lungs are doing, it's immaterial. Death is defined as an event in the brain." After a question regarding the maintenance of body functions through mechanical means, Piepmeier responded, "You can be dead and through machines and medication have a beating heart and the machine blowing oxygen into your lungs and taking carbon dioxide away. . . . [I]t is possible for someone to be dead in a medical definition and to have machines and medications make their heart and lungs perform activities." He also testified that a doctor could issue a notice of death for a person while life support systems continue in place, although the general practice is to wait until the machines have been disconnected. The victim's parents authorized that the machines be disconnected and the victim was pronounced dead.

"Traditionally, in criminal prosecutions for homicide, when the fact or time of death was at issue, the common law defined death as 'the cessation of life' and set a medical standard of the stoppage of the circulatory and respiratory systems." Annot., 42 A.L.R.4th 742, 745 (1985). "[I]n general, some form of brain death is currently considered a valid medical measure of death." Id., 746. In 1980, the National Conference of Commissioners on Uniform State Laws, in concert with the American Medical Association and the American Bar Association, created the Uniform Determination of Death Act. This act creates alternative standards for death: "either irreversible cessation of circulatory and respiratory functions . . . or irreversible cessation of all functions of the entire brain including the brain stem, a determination to be made . . . in accordance with accepted medical standards." Id., 747. Connecticut has not adopted this uniform act.

The defendant argues that because Connecticut has not statutorily defined death as including brain death, we must use a common-law definition that does not

include brain death in determining who or what caused the victim's death in this case. Several other jurisdictions, faced with the same dilemma, chose judicially to adopt a brain death standard in homicide cases. See *State* v. *Fierro*, 124 Ariz. 182, 603 P.2d 74 (1979); *People* v. *Driver*, 62 Ill. App. 3d 847, 379 N.E.2d 840 (1978); *Commonwealth* v. *Golston*, 373 Mass. 249, 366 N.E.2d 744, cert. denied, 434 U.S. 1039, 98 S. Ct. 777, 54 L. Ed. 2d 788 (1977); *State* v. *Meints*, 212 Neb. 410, 322 N.W.2d 809 (1982); *State* v. *Watson*, 191 N.J. Super. 464, 467 A.2d 590, cert. denied, 95 N.J. 230, 470 A.2d 443 (1983); *People* v. *Eulo*, 63 N.Y.2d 341, 472 N.E.2d 286, 482 N.Y.S.2d 436 (1984). Some jurisdictions have instead upheld murder convictions in such a case by applying traditional principles of causation. These jurisdictions utilize the doctrine that medical treatment of a victim, whether reasonable or negligent, does not relieve the perpetrator who caused the medical condition of liability for murder. See *State* v. *Inger*, 292 N.W.2d 119 (Iowa 1980); *People* v. *Vanderford*, 77 Mich. App. 370, 258 N.W.2d 502 (1977); *Cowan* v. *State*, 399 So. 2d 1346 (Miss. 1981); *State* v. *Holsclaw*, 42 N.C. App. 696, 257 S.E.2d 650, appeal dismissed, 298 N.C. 571, 261 S.E.2d 126 (1979); *State* v. *Johnson*, 56 Ohio St. 2d 35, 381 N.E.2d 637 (1978); *Cranmore* v. *State*, 85 Wis. 2d 722, 271 N.W.2d 402 (App. 1978).

We need not adopt judicially a definition of death that includes brain death[5] because traditional principles of causation allow this defendant to be found guilty of murder despite the action of another of removing the victim from life support systems.

Causation is an essential element of the crime of murder. See General Statutes § 53a-54a. "In order for

---

[5] If we were to adopt judicially the Uniform Determination of Death Act, the evidence was ample to find that the victim was within the act's definition of death before the life support systems were disconnected.

legal causation to exist in a criminal prosecution, the state must prove beyond a reasonable doubt that the defendant was both the cause in fact, or actual cause, as well as the proximate cause of the victim's injuries. See W. LaFave & A. Scott, Criminal Law (1972) § 35, pp. 246–51. 'In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that "but for" the antecedent conduct the result would not have occurred.' Id., p. 249. On the other hand, proximate cause requires that 'the forbidden result which actually occurs must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result even though it does differ or happens in a different way from the intended or hazarded result . . . .' Id., p. 248." *State* v. *Leroy*, 232 Conn. 1, 17 n.6, 653 A.2d 161 (1995).

In the present case, it is clear that but for being shot, the victim would not have died that morning, no matter what definition of death is being used. The issue of proximate cause requires more than a "but for" the act of the defendant the harm would not have resulted analysis because intervening acts can cut off the chain of causation in a criminal act. See *State* v. *Munoz*, 233 Conn. 106, 124–25, 659 A.2d 683 (1995); see also *Doe* v. *Mannheimer*, 212 Conn. 748, 757–59, 563 A.2d 699 (1989).

Several cases in Connecticut have held a defendant guilty of murder or manslaughter where the defendant's act was not the immediate cause of the victim's death. In *State* v. *Tomassi*, 137 Conn. 113, 75 A.2d 67 (1950), the defendant's first degree murder conviction was upheld

despite the defendant's argument that negligent care at the hospital, not the bullet wounds the defendant inflicted, caused the victim's death. "One who has wilfully inflicted upon another a dangerous wound, with a deadly weapon, from which death ensued, is guilty of murder or manslaughter, as the evidence may prove, although, through want of due care or skill, the improper treatment of the wound by surgeons may have contributed to the death." Id., 119; see also *State* v. *Block*, 87 Conn. 573, 576, 89 A. 176 (1913) ("it is apparent that it is not necessary that the act or omission should be the direct cause of the death; it is sufficient if it be a contributory cause"); *State* v. *Bantley*, 44 Conn. 537, 540 (1877) ("[i]f one person inflicts upon another a dangerous wound, one that is calculated to endanger and destroy life, and death ensues therefrom . . . he is none the less responsible for the result although it may appear that the deceased might have recovered if he had taken proper care of himself, or that unskillful or improper treatment aggravated the wound and contributed to his death"). In *State* v. *Leroy,* supra, 232 Conn. 1, the court upheld a guilty verdict for manslaughter following an accident in which the defendant was driving while intoxicated, but the victim may also have been partially at fault. "[W]hen several factors contribute, in a chain of events, to cause a victim's injury, the defendant's conduct must have been a cause that necessarily set in operation the factors that accomplish the injury." Id., 13. In *State* v. *Spates,* 176 Conn. 227, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979), the defendant was found guilty of manslaughter when, during a robbery, the defendant tied up the victim, who subsequently died of a heart attack brought on by emotional stress caused by the robbery. In *State* v. *Pellegrino,* 194 Conn. 279, 480 A.2d 537 (1984), the defendant was found guilty of the manslaughter of his accomplice in arson because

the defendant's conduct was a substantial factor in causing the accomplice's death, even though the accomplice's own actions also contributed to his death.

" 'Proximate cause' in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, *unbroken by an efficient, intervening cause, to the resulting death*. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence." (Emphasis added.) *State* v. *Spates*, supra, 176 Conn. 233–34.

The defendant argues that the victim's parents' instruction to disconnect the victim's life support system constitutes an intervening cause to the resulting death. We are not persuaded. After a person has received a massive bullet wound to the brain and is being kept alive only by machinery, and his chances of recovery are slim, it is reasonably foreseeable that relatives of the victim would request that life support systems be disconnected. The removal of those systems is not an intervening cause breaking the chain of causation that started with the defendant's act.

Expert testimony revealed that the removal of life support systems of a brain dead patient comports with reasonable medical practice. Although we have no statutory definition of death in our penal code, we do have a statute that addresses the standard for determining whether a life support system should be disconnected. General Statutes § 19a-504a provides: "(a) For the pur-

pose of this section, 'life support system' means any mechanical or electronic device utilized by any medical facility in order to replace, assist or supplement the function of any human vital organ or combination of organs.

"(b) For purposes of making a determination concerning the continuation or removal of any life support system in a general hospital licensed under section 19a-491, an individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. Determination of death shall be made in accordance with accepted medical standards."

This standard was applied in *State* v. *Carpenter*, 214 Conn. 77, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992). Although the court modified the judgment of murder to manslaughter on the issue of intent, it sub silentio must have determined that the fact that the victim had been pronounced brain dead and was later removed from life support had caused the victim's death because one of the elements of murder, as well as manslaughter, is causation of death.[6]

The statutory definition of murder provides: "A person is guilty of murder when, with intent to cause the death of another person, he *causes the death of such person* . . . ." (Emphasis added.) General Statutes § 53a-54a. The bullet wound sustained by the victim was the proximate cause of the victim's death. The act

---

[6] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby *causes the death of another person.*" (Emphasis added.)

of disconnecting life support systems of a person who is brain dead with little chance of recovery is medically reasonable and is not the death producing cause or a sufficient intervening cause of death to negate the act of the defendant as the cause of death within the terms of the statute. See *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 710, 553 A.2d 596 (1989). The finding of probable cause for murder after the hearing held pursuant to General Statutes § 54-46a[7] was warranted based on the evidence offered at the hearing.

II

The defendant also argues that the trial court abused its discretion when it admitted Young's hearsay statements to Officer Pisciotti as exceptions to the hearsay rule as spontaneous utterances.

Pisciotti testified to having spoken with Young at the scene of the crime. Pisciotti arrived at the scene less than one minute after hearing a radio dispatch. He spoke with Young within fifteen or thirty minutes after arriving for a period of about fifteen minutes. Pisciotti testified that Young was very shaken up and nervous during their conversation and "was spontaneously just muttering out things because he was so wound up." Pisciotti asked Young several questions about what happened that night and the relationships among the victim, the defendant, and Streater. Young responded to the questions asked of him, providing information about the events that began in the convenience store and culminated with the shooting of the victim. In response

---

[7] General Statutes § 54-46a (a) provides: "No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause."

to a question, he also told Pisciotti that the victim and the defendant had argued about Streater previously.

The defendant argues that this testimony should not have been admitted because Young had time and opportunity to fabricate responses before Pisciotti had elicited Young's statement. The defendant further argues that the testimony was improper because it was not limited to a description of the startling occurrence, but rather went into background information.

"In *Perry* v. *Haritos*, 100 Conn. 476, 124 A. 44 (1924), our Supreme Court recognized the spontaneous utterance exception to the hearsay rule. This exception allows otherwise inadmissible statements into evidence to prove the truth of the matter asserted if it is proven that (1) the declaration follows some startling occurrence, (2) the declaration refers to the occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989); *Perry* v. *Haritos*, supra, 484.

"As a preliminary matter, the trial judge must determine whether an utterance qualifies under this exception to the hearsay rule, and that decision will not be disturbed on appeal unless it constitutes an unreasonable exercise of discretion. *State* v. *Stange*, supra [212 Conn. 616–17]; *State* v. *Chesney*, 166 Conn. 630, 638, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974); *Perry* v. *Haritos*, supra [100 Conn. 484]." *State* v. *Cayouette*, 25 Conn. App. 384, 387, 594 A.2d 1020 (1991).

"The requirement that a spontaneous utterance be made 'under such circumstances as to negative the opportunity for deliberation and fabrication' by the declarant . . . does not preclude the admission of statements made *after* a startling occurrence as long

as the statement is made under the stress of that occurrence." (Citation omitted; emphasis in original.) *State* v. *Rodriguez*, 39 Conn. App. 579, 603, 665 A.2d 1357 (1995), rev'd on other grounds, 239 Conn. 235, 684 A.2d 1165 (1996). "While the short time between the incident and the statement is important, it is not dispositive. . . . All material facts should be weighed by the trial judge when determining whether a statement qualifies as a spontaneous utterance." *State* v. *Cayouette*, supra, 25 Conn. App. 388.

The trial court, in ruling the testimony admissible, found that the factors set forth in *Stange* and *Cayouette* had been met. It stated: "The declarant was a passenger or was in a vehicle, the blue Peugeot that had been fired upon, the windows were all blown out from gunshots. The shells were in the immediate area. His declarations to this police officer refer to the occurrence because it refers to the shooter, to the victim, to himself, to their conduct immediately before. It refers to a description by height and by clothing of the shooter. It tells the officer the fact that this declarant recognized the shooter and he knew of the relationship between the victim and the shooter. And the fact that the information was given in response to questions, under these circumstances . . . is not significant. The time gap is probably at a maximum an hour between the actual shooting and the time that the statements were given. And the declarant was visibly upset and sometimes responded directly to questions and sometimes provided additional spontaneous information that was not specifically elicited, he was nervous and he was shaken up. The victim apparently was still at the scene at the time the statements were given at the scene immediately after the shooting. There [is] sufficient evidence to support the conclusion that negates the opportunity for deliberation and a fabrication since the declarant did not speak to anybody, did not speak to the victim, and he spoke to the police officer and gave the information."

We conclude that the trial court did not abuse its discretion in admitting Pisciotti's testimony. The trial court properly applied the law concerning spontaneous utterances to the facts of the case and properly ruled that the testimony was admissible under the hearsay exception.

III

The defendant alleges that the trial court improperly instructed the jury regarding Young's credibility. At the time of trial, Young was incarcerated on a number of pending charges, the arrests for all of which had occurred after March 1, 1992, the date of the shooting of the victim. Young received eight nolles, four for felony charges and four for misdemeanor charges, before testifying in this case. Young denied that any of the nolles had been in exchange for testimony in this case. If convicted of the remaining charges, he could be incarcerated for more than 100 years.

With respect to witnesses' credibility, the trial court instructed in general: "You should consider any possible bias or prejudice he or she may have whether for or against the state or the defendant, his or her interest or lack of interest of whatever sort in the outcome of the trial, his or her ability to observe facts correctly and to remember and relate them truly and accurately. You should test the evidence he or she gives by your own knowledge of human nature and of the motives which influence and control human action. If any facts are admitted or otherwise proved to you, you may well bring them in relation with his or her testimony and see if they fit together with it. In short, you are to bring to bear upon it the same considerations and use the same sound judgment you applied to the question of truth and veracity which are daily presenting themselves for your decision in the ordinary affairs of life."

The trial court gave further instructions specifically regarding Young's credibility: "You have heard evidence that Germaine Young has been arrested and charged with eight felonies and one violation of probation. You again are not required to disbelieve a witness because he has such charges pending against him. However, in weighing the credibility of Germaine Young you may consider the fact that these charges are pending against him and that he is presently awaiting trial on those charges. You may give such weight to such evidence as you determine to be reasonable in weighing the credibility of Germaine Young."[8]

"If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a

---

[8] The instruction that the defendant had requested regarding Young's credibility is as follows: "You have heard testimony, as I recall, related to Germaine Young that a number of felony charges and other charges pending against him were not prosecuted against him by the State of Connecticut. In addition, you have heard testimony that Mr. Young has pending as I recall eight felony charges and a violation of probation. You the jury may consider the fact that he will not be prosecuted for certain crimes in weighing his testimony. In addition, you may consider the fact that he has pending charges and the amount of time he faces on those pending charges while he has testified here in court. The state is certainly permitted to make a decision not to prosecute certain charges and is entitled to call as witnesses people with whom such situations have occurred. You may accept the testimony of such a witness and weigh such witness's testimony in determining if the state has proven the defendant guilty beyond a reasonable doubt."

"On the other hand, the testimony of a witness for whom felony charges have not been prosecuted by the state and who has pending charges with substantial periods of incarceration hanging over his head should be scrutinized by you with greater care than the testimony of other witnesses. This is so because such witness may have an interest in the case different from any ordinary witness. A witness who realizes that he may be able to face fewer criminal charges or may receive a lighter sentence by giving testimony favorable to the prosecution, may have a motive to testify either falsely or how he believes will most benefit the state. Therefore, you must examine the testimony of this type of witness with caution and weigh such testimony with great care. As with all witnesses you may accept the testimony, reject it, or accept only a portion. You may give it whatever weight, if any, you find it deserves."

ground for reversal." *State* v. *Ortiz*, 217 Conn. 648, 662, 588 A.2d 127 (1991). Most of the first paragraph of the defendant's requested instruction was covered by the trial court's instructions in that the trial court's instructions pointed out that the jury could consider Young's pending charges when weighing his credibility. The trial court gave the jury discretion in what weight to give to Young's credibility.

The second paragraph of the defendant's requested instruction concerns the need to scrutinize with great care the testimony of a witness who has pending felony charges that could lead to lengthy periods of incarceration. The defendant argues that such a charge is appropriate because such a witness has an interest in lying to benefit the state's case in exchange for a reduction in his own potential sentence. The state points out that it found no support for such an instruction under Connecticut law. While General Statutes § 52-145 (b) provides: "A person's . . . conviction of crime may be shown for the purpose of affecting his credibility," it does not state that such a conviction requires an instruction to scrutinize the person's credibility any more than normal. In *State* v. *Smith*, 16 Conn. App. 223, 547 A.2d 102 (1988), the defendant claimed that the trial court improperly refused to instruct the jury that a particular witness' credibility should be examined closely because he had criminal charges stemming from the same incident pending against him. This court held that the defendant was not entitled to that charge because the witness was not a culpable party " 'who could himself be subject to prosecution depending upon the veracity of his version of the particular criminal transaction involved.' " Id., 229, quoting *State* v. *Cooper*, 182 Conn. 207, 212 n.5, 438 A.2d 418 (1980). The same is true in the present case because Young was not culpable himself. Thus, the defendant was not entitled to his

requested charge, and the trial court did not abuse its discretion by refusing to so instruct the jury.

IV

The defendant's fourth argument involves the trial court's admission into evidence of Melvin McCoy's animosity toward the defendant. Young's testimony revealed that the victim did not like the defendant hanging around with Streater because she is the mother of the victim's child and the victim did not like the defendant to be around his child. In addition, Streater testified that, on one occasion two weeks prior to the shooting incident, the victim, brandishing a gun outside Streater's apartment, screamed at the defendant to stay away from Streater and the child.

The trial court admitted this evidence as bearing on the issue of a motive of revenge and "whatever the state of mind of the victim is relevant . . . as to the apparent animosity between the victim and the defendant as felt by the victim." The court also noted that this history of animosity would help explain the staring incident in the convenience store prior to the shooting. The defendant argues that this evidence should not have been admitted because it is hearsay and the state of mind exception does not apply, and, furthermore, it is irrelevant because it is highly prejudicial and does not demonstrate that the defendant shared the victim's vengeful feelings.

The defendant argues that the case of *State* v. *Duntz*, 223 Conn. 207, 231–33, 613 A.2d 224 (1992), controls this issue. In *Duntz*, our Supreme Court held that the trial court improperly admitted testimony of several witnesses who stated that the victim had told them that the victim feared the defendant.[9] The trial court

[9] The state cites *State* v. *Crafts*, 226 Conn 237, 627 A.2d 877 (1993), as a case in which a hearsay statement relating to a victim's alleged fear of a defendant was admissible, but the state makes no in depth comparison in

admitted the evidence under the state of mind exception to the hearsay rule for the limited purpose of demonstrating that the victim feared the defendant. The Supreme Court noted that the hearsay exception would be available only if the victim's mental state were relevant, and, in *Duntz*, it was not. "The state claims that the victim's alleged fear of the defendant was relevant because it tended to show that the victim and the defendant had an antagonistic relationship and, therefore, that the defendant had a motive and the intent to kill the victim. We conclude, however, that the jury could not have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation. . . . [I]n view of the tremendous potential for this evidence of subjective fear to prejudice the defendant unfairly, we conclude that it was not admissible under the state of mind exception to the hearsay rule." Id., 233.

"Trial courts have broad discretion in determining the relevancy of evidence. . . . Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue." (Citation omitted; internal quotation marks omitted.) *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). "The trial court has broad discretion in determining the relevancy of evidence. . . . Rulings on such matters will be disturbed on appeal only upon a showing of a clear abuse of discretion." (Citations omitted; internal quota-

order to reconcile *State* v. *Duntz*, supra, 223 Conn. 231–33, and *Crafts*. In view of our conclusion that the emotion of fear differs from that of anger, we need not discuss the different facts of the two cases.

tion marks omitted.) *State* v. *Alvarez*, 216 Conn. 301, 309, 579 A.2d 515 (1990).

We conclude that the victim's ire toward the defendant is relevant. The challenged evidence tends to establish that animosity existed between the victim and the defendant. The incident at Streater's apartment constituted a threat. It is reasonable to infer from this threat that the defendant might have wanted to take revenge. This is different from the situation in *Duntz* because a victim's fear of an attacker is less relevant than a victim's hatred of an attacker. Hatred begets more anger and perhaps revenge, while fear is far less likely to produce a heated response. The trial court did not abuse its discretion by admitting the evidence.

V

The defendant's final argument is that the trial court improperly rejected the defendant's offer of proof and refused to allow the defendant to present evidence of others' motives to shoot the victim.[10] The defendant presented evidence in an offer of proof that the victim was a known drug dealer who was active in the narcotics trade. Thus, the defendant argued, the shooting of the victim was more likely to have been the result of his involvement in the drug dealing world than it was to be the result of a love triangle. The trial court declined to admit the proffered evidence, stating that the evidence was insufficient for an offer for third party culpability because it was not directed to any one person.

---

[10] The defendant wanted to admit evidence of the following: (1) that, at the time of his death, the victim was carrying packets of cocaine and marijuana and a large amount of cash; (2) that the victim was a known drug dealer; (3) police and arrest records of the victim's illegal drug activities; (4) that a threat on the victim's life had been made by another individual; and (5) that a burglary complaint had been filed by the victim in which $2400 in cash was stolen and replaced with a note saying, "We'll be back, dumb ass, we know where everything is."

The defendant claims that the evidence it sought to admit involved the defendant's absence of motive. This evidence of the victim's lifestyle was meant to undercut the defendant's motive to commit the crime.

"[E]vidence of third party culpability must directly connect the third party to the crime. It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . . Unless the direct connection exists, it is within the discretion of the trial court to refuse to admit such evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 258, 630 A.2d 577 (1993).

Here, the defendant points to no specific individual who might have had a motive to shoot the victim. There was no evidence to suggest that any other persons were even at the scene of the shooting aside from the defendant and his friends. That others might also have had a motive to shoot the victim in no way rebuts the defendant's motive to shoot the victim; it merely suggests that more than one person could have had a motive to kill him. This evidence was not relevant, and admission of it would serve only to confuse the jury with additional information. The trial court did not abuse its discretion when it refused to admit it.

The judgment is affirmed.

In this opinion the other judges concurred.