STATE OF CONNECTICUT *v.* RALPH TORRES
(AC 19995)

Spear, Hennessy and Shea, Js.

---

Argued January 14—officially released July 4, 2000

*M. Donald Cardwell*, with whom was *Joseph E. Mascaro*, for the appellant (defendant).

*Leon F. Dalbec*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Kevin J. Murphy*, assistant state's attorney, for the appellee (state).

*Opinion*

SHEA, J. The defendant, Ralph Torres, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a[1]

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to

and criminal possession of a firearm in violation of General Statutes § 53a-217.[2] On appeal, he claims that the court improperly admitted (1) statements made by a witness as evidence under the spontaneous utterance exception to the hearsay rule and (2) evidence concerning the alleged gang affiliations of the defendant and the victim, and statements about such affiliations made by the prosecutor. He claims further that the court improperly failed to instruct the jury to disregard such evidence and statements.[3] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 31, 1993, the victim, Felipe Santana, was walking with Nelson Albert toward the intersection of Wadsworth Street and Park Street in Hartford, an intersection known to be within the territory of the Los

be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm or electronic defense weapon when he possesses a firearm . . . and (1) has been convicted of a capital felony, a class A felony, except a conviction under section 53a-196a, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196b, a class C felony, except a conviction under section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216, or (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120. For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

[3] The defendant also raised on appeal a claim that he was denied his constitutional right to effective assistance of counsel. This claim, however, was withdrawn at oral argument. "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim." (Internal quotation marks omitted.) State v. Crespo, 246 Conn. 665, 687–88, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

Solidos gang. When they arrived at the intersection, they met Chris Davila and Lisandra Torres.[4] The victim, Albert and Davila were members of the Los Solidos gang at that time.[5]

Meanwhile, the defendant was "hanging out" with Hector Ramirez and a person who used the name of "Nice" at 185 Seymour Street, which was in the territory of the Latin Kings gang. The defendant, Ramirez and Nice were members of the Latin Kings. At approximately 8:30 p.m., the defendant went to a store on the corner of Park Street and Wadsworth Street to purchase beer. Prior to his departure, Ramirez told him "to be careful because that is where all the Solidos hang at." Soon thereafter, the victim, Davila and Albert observed the defendant enter Los Solidos territory as he approached the intersection at Park Street and Wadsworth Street on the opposite side of the street from where they were standing. Davila and Albert testified at trial that it was unusual to see a rival Latin King in Los Solidos territory, and they were wondering what a Latin King gang member was doing on Wadsworth Street. Albert testified also that the victim told him, "Don't worry about it. Everything is straight. Just don't sleep on it."[6]

Meanwhile, a car that did not have its headlights on approached the intersection. Turning their attention to the car and talking with the individuals in the car, the victim and Albert lost sight of the defendant. Moments after the car departed, the defendant reappeared behind the victim, shot him in the back at very close range,

---

[4] Lisandra Torres is not related to the defendant, but was a friend of both the defendant and the victim.

[5] The testimony at trial indicated that the victim was a "star" in the Los Solidos gang, which meant that he held a fairly high position in the gang.

[6] Albert testified that "[j]ust don't sleep on it" meant "don't forget about him. Keep him in your eyesight in case he might try something."

pushed him to the ground and then fled, running toward Seymour Street.

Davila ran into a nearby store and instructed the clerk to call for an ambulance. Officer Michael Sheldon of the Hartford police department arrived on the scene and noticed the victim lying face down and "lifeless" in the road with "a large quantity of blood coming from [the victim's] mouth." In fact, the victim was already dead when Sheldon arrived.[7]

The testimony at trial disclosed that approximately two weeks before the victim was murdered, he had been in a fistfight with an individual named Melvin, who was a "ranking member" of the Latin Kings. Testimony indicated further that Melvin's position in the Latin Kings was "mighty high"; even higher than the victim's rank in the Los Solidos gang.

I

The defendant claims that the court improperly admitted hearsay evidence pursuant to the spontaneous utterance exception to the hearsay rule. Specifically, the defendant claims that the court improperly allowed in evidence statements made by Davila to Sheldon soon after the shooting regarding the identity of the shooter.

Additional facts are necessary for our resolution of this claim. Sheldon was the first officer to arrive on the scene after the shooting. Prior to his testifying, the state made an offer of proof outside the presence of the jury that Sheldon's testimony would include hearsay statements pursuant to the spontaneous utterance exception to the hearsay rule. During the proffer, Shel-

---

[7] An autopsy revealed that a .32 caliber bullet had entered the victim's back and had transversed through his left lung, heart and pulmonary artery, coming to rest just above his breastbone. The autopsy revealed further that deposits of soot and gunpowder granules surrounding the entrance wound suggested that the "weapon was really close to the skin . . . when fired."

don testified that, when he arrived at the crime scene at approximately 9 p.m., the victim was lying motionless in the road with a large amount of blood coming from his mouth, and that one individual, later identified as Davila, was standing over the victim. Sheldon then approached the victim and checked him for vital signs, of which he found none. Sheldon did note, however, that rigor mortis had not set in at all and that the body was still fresh.

After observing the victim, Sheldon asked Davila, "What is going on here?" Davila told him that he saw what had happened. Thereafter, Sheldon placed Davila in his police cruiser, which was within a few feet of the victim's body. Sheldon then asked Davila who committed the crime, and Davila responded that "he knew who [did] it." Sheldon testified that Davila never actually named the shooter, but he described the person who had committed the crime as "[a] Hispanic male, about twenty-five to twenty-seven years of age, wearing a blue shirt with white shorts, and light [complexion]. And that he had had a black handgun, possibly an [automatic] type." In addition, Sheldon testified, over defense counsel's objection, that "[Davila] was emotionally upset and it appeared he was still crying" when Sheldon first saw him and when Sheldon asked him for a description of the shooter. Sheldon testified further that he had put the description of the shooter given by Davila into his police report and that Davila knew the suspect, but not by name. On the basis of the foregoing, the court concluded that the statements made by Davila pursuant to this proffer were admissible, qualifying under the spontaneous utterance exception to the hearsay rule.

"In *Perry* v. *Haritos*, [100 Conn. 476, 124 A. 44 (1924)], our Supreme Court recognized the spontaneous utterance exception to the hearsay rule. This exception allows otherwise inadmissible statements into evidence

to prove the truth of the matter asserted if it is proven that (1) the declaration follows some startling occurrence, (2) the declaration refers to the occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . . The overarching consideration governing these requirements is whether the statements were made before reasoned reflection had taken place. . . . *State* v. *Bowman*, 46 Conn. App. 131, 140, 698 A.2d 908 (1997).

"As a preliminary matter, the trial judge must determine whether an utterance qualifies under this exception to the hearsay rule, and that decision will not be disturbed on appeal unless it constitutes an unreasonable exercise of discretion. . . . The requirement that a spontaneous utterance be made under such circumstances as to negative the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence. . . . While the short time between the incident and the statement is important, it is not dispositive. . . . All material facts should be weighed by the trial judge when determining whether a statement qualifies as a spontaneous utterance." (Citations omitted; internal quotation marks omitted.) *State* v. *Guess*, 44 Conn. App. 790, 803–804, 692 A.2d 849, aff'd, 244 Conn. 761, 715 A.2d 643 (1999).

In the present case, the challenged statements concerned the description of the perpetrator and were made while Davila was under the stress of having just witnessed his friend, the victim, being shot minutes earlier and having observed his friend lying lifeless in the road, bleeding profusely. The defendant claims that there was "absolutely no evidence as to how much time had elapsed between when Officer Sheldon arrived on

the scene and when he placed Davila in the cruiser," and that this was "a critical component." "While the element of time between the startling occurrence and the statement itself is important, it is not dispositive. . . . The time element is but one factor to be weighed by the trial judge, together with any other material facts in the circumstances surrounding the statement, when deciding the preliminary question of whether a statement was spontaneous." (Citation omitted.) *State* v. *Stange*, 212 Conn. 612, 618, 563 A.2d 681 (1989).

Despite the defendant's claim to the contrary, Sheldon testified that the statements were made "within minutes" after his arrival, that he was the first officer to arrive on the scene, that Davila was standing close to the victim's body and was "emotionally upset," and that "it appeared that [Davila] was still crying" when he made the declarations.[8] After viewing the record, we cannot say that the court abused its discretion in determining that the declarations were made under circumstances that negated the opportunity for deliberation and fabrication by the declarant. We conclude, therefore, that the court did not abuse its discretion in admitting the hearsay statements under the spontaneous utterance exception to the hearsay rule.

Furthermore, we agree with the state that even if the court had abused its discretion in allowing Davila's statements in evidence as spontaneous utterances, that evidence was merely cumulative of other descriptions previously given by Davila. Prior to trial, Davila had made an out-of-court identification of the defendant from a photographic array. Moreover, the state introduced Davila's prior testimony from the defendant's first trial, which ended in a mistrial. In that trial, Davila

---

[8] Roberto Garcia, another witness who arrived at the scene shortly after the shooting, testified that upon approaching the scene and asking Davila what had happened, Davila "just froze" and "[s]aid nothing at all," and that he thought that Davila "was in shock."

had made an in-court identification of the defendant as the perpetrator of the crime.[9]

## II

The defendant claims next that the court improperly admitted evidence of, and permitted statements by the prosecutor relating to, the alleged gang affiliations of the defendant and the victim, and improperly failed to instruct the jury to disregard such evidence and statements.

As an initial consideration, our review of the record reveals that this claim was not properly preserved at trial. Additional facts are necessary for our disposition of this issue. During the state's direct examination of the witness Lisandra Torres, the following colloquy took place:

"[Assistant State's Attorney]: All right. Was [the defendant] associated with any of the street gangs?

"[Defense Counsel]: Objection.

"The Court: Why don't we—I will sustain it at this time without prejudice. Why don't you either back up to see what her knowledge is of street gangs; then you need to establish to the court some kind of relevancy before I permit it. I will sustain the objection and ask the jury to disregard any reference to street gangs."

Soon thereafter, outside the presence of the jury, the following colloquy transpired:

"[Assistant State's Attorney]: Well, Your Honor, I also have one other thing while the jury is excused. Counsel objected to the question about the defendant's gang affiliation. I do have State v. Mozell [40 Conn. App. 47,

---

[9] The court concluded that Davila was unavailable and the transcript of Davila's testimony from Torres' earlier trial, which ended in a mistrial, was read into evidence.

668 A.2d 1340, cert. denied, 236 Conn. 910, 671 A.2d 824 (1996)]. . . .

"The Court: I know it's permissible, but there has to be some foundation she knows something about gangs. She knows what a gang is. There has to be relevancy to the gang.

\* \* \*

"The Court . . . Now, here is what I had in mind on the trial. . . . That the defendant's gang was involved in a dispute with a rival gang. That is what you have to establish, if she knows about gangs. She shows there is rivalry that the dispute was sparked by recent [violent] confrontation the challenge was relevant to motive. You just can't abstract a question to a witness and say he is a member of a gang because that is clearly prejudicial. Without establishing she knows what gangs are in existence, that she knows there is some conflict and this is retribution from one gang member to another.

"[Assistant State's Attorney]: I think she can establish her knowledge that he is a member of the Latin Kings street gang. She's aware of that from living in the area.

\* \* \*

"[Assistant State's Attorney]: I intended to introduce the other evidence [concerning] the Latin Kings and Los Solidos through other witnesses. I don't necessarily intend to go through that.

"The Court: You're going to be able to [establish that] motivation for the killing was in part . . . some type of gang rivalry?

"[Assistant State's Attorney]: Yes, Your Honor. . . .

"The Court: Well, I will caution the jury that this has to be connected. If you don't connect it, *I will entertain a motion to strike it at a later time.*

\* \* \*

"The Court: Are you following me, [defense counsel]? *If he doesn't make the connection then I will entertain a motion to strike and ask the jury to disregard it.*

"[Defense Counsel]: Very well, Your Honor." (Emphasis added.)

When the trial resumed, Lisandra Torres testified that the victim was associated with the Los Solidos gang and that the defendant was associated with the Latin Kings. She provided no testimony as to the defendant's motive for committing the murder, nor did she testify that the shooting was related to the victim's and the defendant's gang affiliations. In addition, there were numerous other references to the alleged gang affiliations of the victim and the defendant throughout the trial. Despite the court's clear warnings, however, the defense counsel never filed any motion to strike that evidence. We conclude that because defense counsel failed to file a motion to strike the evidence of gang affiliations, as advised by the court, the issue was not properly preserved at trial.

Because the defendant did not properly preserve this claim before the trial court, we now must determine whether the defendant can prevail under the four prong test articulated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10] "While the first two prongs of

---

[10] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

the *Golding* analysis consider whether the defendant's claim is reviewable, the last two prongs address the merits of the claim. . . . In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Askew*, 55 Conn. App. 34, 38, 739 A.2d 274, cert. denied, 251 Conn. 918, 740 A.2d 866 (1999).

We conclude that the defendant's claim fails the second prong of *Golding* because the claim is merely evidentiary and not of constitutional magnitude. Specifically, the defendant claims that when a defendant's gang affiliation is brought into evidence in a trial, prejudice, likewise, is introduced. The defendant claims further that he had been branded throughout the trial as a gang member and that that was per se prejudicial. Therefore, he claims that he was denied his due process rights to a fair trial. Our case law, however, states otherwise. In *State* v. *Taylor*, 239 Conn. 481, 500, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997), the defendant argued that the trial court deprived him of a fair trial by allowing the state to introduce testimony relating to his membership in the Latin Kings. As in the present case, the defendant in *Taylor* did not challenge the testimony at trial and argued on appeal that his claim warranted review under *Golding*. Id. The *Taylor* court was unpersuaded by that argument and stated that "we do not find that the defendant's claims concerning the admission of evidence of his involvement in gang activity allege a violation of constitutional magnitude." Id., 502; see also *State* v. *Mozell*, supra, 40 Conn. App. 51–52 (testimony admitted demonstrating that defendant was gang member relevant to prove motive). On the basis of the forego-

ing, the *Taylor* court concluded that *Golding* review was not warranted. *State* v. *Taylor*, supra, 503.

The defendant in this case attempts to distinguish the factual scenario in *Taylor* by pointing out that the defendant in *Taylor* testified on his own behalf and admitted that he was a ranking member of the Latin Kings; id., 502; while the defendant in the present case did not testify in his own defense. This claimed distinction is of no moment because, while most of the references to the defendant's gang affiliation were made by the state's witnesses, defense counsel also referred to the gang issue as follows: "Now, again, there is a gang war going on in Hartford. Certainly, this was between two rival Puerto Rican gangs. . . . Now this is a gang war. Two gangs against each other posing either bitter enemies to the point where they would actually consider drastic measures . . . . [Lisandra Torres] also indicated that she was friends with [the defendant]. She is not a gang member, she knows both parties, but, simply put, she was somewhere in the middle, she had friends on both sides. She indicated that the reason why she did not testify to the statement that she testified to during her last time on the stand was that she was afraid of retaliation from gang members."

While we recognize that counsel's remarks during closing argument are not evidence, coupled with his failure to file a motion to strike the evidence of the defendant's alleged gang affiliation introduced by the prosecution, defense counsel's remarks cripple the defendant's claim.

The defendant also seems to claim that the court had a sua sponte duty to strike the evidence concerning gang affiliation to assure a fair trial. We reject this notion. While we recognize that, in certain instances, a trial court does have a constitutional obligation to intervene, sua sponte, for example, when there is an

allegation of juror misconduct; see *State* v. *Brown*, 235 Conn. 502, 525, 668 A.2d 1288 (1995); or when there is substantial evidence that a defendant is not competent; see *State* v. *DeAngelis*, 200 Conn. 224, 242, 511 A.2d 310 (1986); this is not such a case. Because, as we previously determined, this issue was evidentiary in nature and not constitutional, the court did not have a sua sponte duty to intervene.

The judgment is affirmed.

In this opinion the other judges concurred.